******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JASON JOHNSON
## (SC 20437)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of numerous crimes, including sexual assault in the first degree and unlawful restraint in the first degree, the defendant appealed to this court. The defendant had entered an apartment in which two sisters, F and M, were staying, where he threatened them with a revolver, forced them to undress, prevented them from leaving, and assaulted them sexually. At some point, M fled the apartment and encountered C, and one of C's companions called 911. F and M were transported to a hospital, where a nurse evaluated them and administered sexual assault kits. The defendant was arrested, and the police seized the clothing and jewelry he was wearing at the time of his arrest and the clothing he had worn the day of the incident. At the defendant's jury trial, R, a DNA analyst at the state forensic laboratory, testified about the comparison between known DNA profiles, which were taken from the defendant, F, and M, and DNA profiles from evidentiary samples, which were taken from the sexual assault kits, swabs of the defendant's clothes and jewelry, and a cigarette butt found in the apartment. R explained that F's and M's DNA profiles were included in the DNA profile drawn from the defendant's jeans, that M's DNA profile was included in profiles generated from the defendant's underpants, and that F's and the defendant's DNA profiles were both included in the DNA profile drawn from the cigarette butt. N, a biologist at the state laboratory, also testified regarding the forensic analysis performed in relation to the defendant's case, specifically, about the presence of certain substances found in samples from the sexual assault kits and the defendant's clothing. The state also presented evidence that the defendant was wearing a global positioning system (GPS) monitoring device at the time of the incident, which revealed that he was at or near the apartment around the time in question. The defendant filed a posttrial motion for a new trial, claiming that his right to a fair trial had been violated insofar as the prosecutor and certain witnesses referred to F and M as "victims" during trial. He also filed a supplemental motion for a new trial, claiming that the state had violated his due process rights by failing to correct false or misleading testimony concerning a pretrial meeting attended by F, the prosecutor, and an investigator, K. At that meeting, F, who was the defendant in an unrelated criminal case, indicated her hope to enter a drug treatment program. At the defendant's trial, however, F testified that she never had asked the state's attorney's office for help with her pending criminal case, and K testified that the state had made no promises to F. The trial court denied both posttrial motions. On the defendant's appeal from the judgment of conviction, *held*:

1. The defendant could not prevail on his unpreserved claim that his federal constitutional right to confrontation was violated by virtue of the admission of R's testimony regarding certain DNA profiles and N's testimony regarding certain forensic reports:

a. Contrary to the state's argument, the defendant did not waive his confrontation claim on the ground that defense counsel failed to object to N's and R's testimony and used portions of the DNA evidence to the defendant's advantage:

The law in effect at the time of the defendant's trial provided that a defendant's federal constitutional right to confrontation is not necessarily offended when a forensic laboratory employee who was not involved in preparing a DNA profile testifies that a comparison using that profile implicates the defendant, and it was not until after the defendant's trial that this court issued its decision in *State* v. *Walker* (332 Conn. 678), which held that, to satisfy the dictates of the confrontation clause, the state must call as a witness at least one analyst with personal knowledge concerning the accuracy of a numerical DNA profile, even though all

analysts who participate in the process of generating a DNA profile need not testify.

Because this court had not yet decided *Walker* when the defendant's case was tried, he arguably would not have had a colorable confrontation claim under the law in effect at the time of trial, and, accordingly, defense counsel's failure to object to R's and N's testimony, as well as counsel's choice to highlight whatever support for the defendant's position he could glean from the testimony of R and N and certain laboratory reports, did not constitute a knowing and intelligent waiver of the defendant's confrontation claim.

b. This court declined to review the defendant's unpreserved claim that R's testimony violated his confrontation rights on the ground that R was not involved in generating, and had no personal knowledge of, certain DNA profiles used in the comparisons about which R testified, the record having been inadequate to review that claim:

The defendant failed to establish the extent of R's involvement in or personal knowledge of the process of generating DNA profiles from the known samples because, when the prosecutor asked R whether she generated the known DNA profiles from M, F and the defendant, R responded in the passive voice, which created an ambiguity as to whether it was R who personally generated the profiles or, if it was not R, whether R had personal knowledge of their generation.

Moreover, the defendant failed to establish the extent of R's involvement in or personal knowledge of the process of generating DNA profiles from certain evidentiary samples, as the record was clouded by indeterminate exchanges between the attorneys and R, as well as R's use of the passive voice, all of which made it impossible to assess whether the work was that of R or, if it was not, whether R had personal knowledge of how the profiles were generated.

c. The defendant could not prevail on his unpreserved claim that N's testimony about certain forensic reports violated his confrontation rights on the ground that N had no direct involvement in or personal knowledge about the underlying testing or handling of the samples that formed the basis of those reports, as the state satisfied its burden of establishing that any confrontation clause violation was harmless beyond a reasonable doubt:

The record was adequate to review the defendant's claim regarding N's testimony, that claim was of constitutional magnitude, and the state conceded, and this court agreed, that N offered testimonial hearsay, in violation of the defendant's confrontation rights under *Walker*, which permits only the examining analyst or another witness with the requisite personal knowledge to testify regarding the results of forensic reports, as N explicitly referred to, relied on, and vouched for the quality of work that she, the technical reviewer, did not perform when she testified about the presence of certain substances in samples from the sexual assault kits and the defendant's clothing.

Nevertheless, the state satisfied its burden of establishing that the confrontation clause violation was harmless beyond a reasonable doubt, because, even without the portions of N's testimony that were admitted in error, the state's case against the defendant was compelling, and there was a substantial and strong body of evidence indicating that the charged crimes were committed and that the defendant was the perpetrator, which were the two major issues around which N's testimony centered.

Specifically, F's testimony related how the defendant had entered the apartment and repeatedly sexually assaulted her and M, and that testimony was corroborated by the testimony and medical report of the nurse who examined F, F's statement to the police, and C's testimony regarding his encounter with M after M fled the apartment.

With respect to whether the defendant was the perpetrator, the state presented evidence that F identified the defendant in a photographic array, her statement to the police describing the perpetrator's hair and clothing, which matched that of the defendant, DNA evidence confirming that the defendant had been in physical contact with M and F, GPS data placing the defendant at or near the crime scene around the time of the incident, and certain evidence of the defendant's consciousness of guilt.

2. The trial court did not abuse its discretion in denying the defendant's supplemental motion for a new trial, in which the defendant claimed that the prosecutor had violated his due process rights by failing to correct the allegedly false or misleading trial testimony of F, who denied having asked the state for assistance with her pending criminal case, and of K, who testified that the state had made no offers or promises to F:

a. Although F's testimony that she never asked the state for help with her pending criminal case was technically true, it was misleading insofar as her statements at the pretrial meeting with the prosecutor and K regarding F's hope to enter a drug treatment program suggested an implicit request for the state's assistance with her drug problem or, potentially, with her criminal case.

Nevertheless, F's testimony was not substantially misleading because it was not untrue in a manner that would have been obvious to the prosecutor, as F did not expressly ask the state for any help with her pending criminal case, and any tendency F's testimony had to mislead the jury was cured when the jury was made aware, through the prosecutor's questioning of K, that F had expressed, during the pretrial meeting, her wish to enroll in a drug treatment program.

b. Although the state presented and failed to correct K's substantially misleading testimony, that testimony was not material and, therefore, did not require reversal of the defendant's conviction:

The state conceded, and this court agreed, that K's testimony was substantially misleading, insofar as the prosecutor should have elicited testimony from K, after K testified that the state had made no promises to F, about what K told F that K would tell the other prosecutor handling F's criminal case.

Notwithstanding the state's argument that due process was satisfied inasmuch as the prosecutor disclosed the pretrial meeting to defense counsel before trial began and to defense counsel and the trial court during a midtrial meeting held outside the presence of the jury, those disclosures were not sufficient to cure K's misleading testimony, as it was the prosecutor who elicited the substantially misleading testimony from K on direct examination, the prosecutor used that testimony to the state's advantage during closing argument, K's testimony was important to the state's case insofar as it bolstered the credibility of F, who was the state's central witness, the truth was not brought to the attention of the jury by defense counsel, and the jury was never informed that the prosecutor offered to tell the other prosecutor handling F's criminal case that F wanted to enter a drug treatment program.

Although the state's failure to correct K's testimony prevented the jury from accurately assessing both K's and F's credibility, K's credibility was largely immaterial, and there was no reason to believe that the result of the defendant's trial would have been different if the jury had determined that K lacked credibility.

Because K's testimony helped bolster F's credibility, and because the jury may have treated F's testimony more skeptically if it had known of F's implicit inducement to testify, this court considered the strength of the state's case in the absence of F's trial testimony and concluded that the misleading testimony was not material to the result of the trial, insofar as F's testimony was corroborated by her own prior statements and other sources, F's potential inducement to testify falsely was limited, the jury reached a verdict quickly, even in the face of other impeachment evidence, and the jury found the defendant not guilty on one charge, indicating that it was able to assess F's credibility independently of the influence of K's substantially misleading testimony.

3. The trial court did not abuse its discretion in denying the defendant's motion for a new trial, in which he claimed that his right to a fair trial was violated when the prosecutor and certain witnesses referred or alluded to F and M as "victims" on the ground that the primary issue at trial was whether any crime had been committed:

This court and the Appellate Court repeatedly have concluded that a prosecutor's infrequent use of the term "victim" does not constitute prosecutorial impropriety, and the prosecutor's single use of the term

"victim" in the present case was not improper, particularly when she used the term only in an attempt to clarify a detective's testimony.

With respect to the defendant's argument that the use of the term "victim" fourteen times by certain of the state's witnesses compromised his right to a fair trial, even if each of those uses was improper, this court could not conclude that the defendant satisfied his burden of demonstrating that those improprieties were so egregious that they amounted to a denial of due process, as the trial court, on at least three separate occasions during trial, issued curative instructions directing the jury to disregard the witnesses' use of the term "victim" and, at the outset of the trial, emphasized to the jurors that they would be solely responsible for determining the credibility of the witnesses.

Argued March 28—officially released October 25, 2022

*Procedural History*

Two part substitute information charging the defendant, in the first part, with two counts each of the crimes of sexual assault in the first degree and unlawful restraint in the first degree, and one count each of the crimes of robbery in the first degree and assault in the second degree, and, in the second part, with being a persistent dangerous felony offender, brought to the Superior Court in the judicial district of Hartford, where the first part of the information was tried to the jury before *Graham, J.*; verdict of guilty of two counts each of sexual assault in the first degree and unlawful restraint in the first degree, and one count of assault in the second degree; thereafter, the defendant was presented to the court, *Gold, J.*, on a plea of guilty as to the second part of the information; subsequently, the court, *Graham, J.*, rendered judgment in accordance with the verdict and plea, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Matthew A. Weiner*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Jason Johnson, was convicted, following a jury trial, of two counts each of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and unlawful restraint in the first degree in violation of General Statutes § 53a-95, and one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2). The defendant appeals from the judgment of conviction directly to this court.[1] On appeal, the defendant claims that (1) the admission of the testimony of a forensic biologist and a DNA analyst violated his rights under the confrontation clause of the sixth amendment to the United States constitution, (2) the state violated his due process rights by failing to correct the false or substantially misleading testimony of its witnesses, and (3) the use of the term "victim" by the prosecutor and some of the state's witnesses during the trial prejudiced him. We conclude that the defendant's claims fail and, accordingly, affirm the judgment.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. On Thanksgiving night, November 23, 2017, F,[2] the testifying victim, was living in a vacant apartment on Zion Street in Hartford. Her younger sister, M, was with her in the apartment that night. F and M were in a bedroom when the defendant, whom F did not know, entered the apartment uninvited.

Threatening F and M with a revolver, the defendant forced them to undress and prevented them from leaving the bedroom. He proceeded to assault them sexually by, among other things, forcibly penetrating both F and M vaginally with his penis. He also penetrated M anally with his penis and made both F and M perform fellatio on him. He further made M perform cunnilingus on F, after striking M on the head with the revolver. At one point, he ordered F to kill M, but F refused.

Thereafter, two other men entered the apartment, one known to F as Mario and one who was unknown to F. The defendant encouraged the unknown man to join in the sexual assaults, but he declined because of a lack of condoms.

At some point during the incident, M fled the apartment, while naked or partially dressed, and ran to a nearby store to seek help. In doing so, she encountered Phillip Cummings and his companions. She told Cummings that she had just been raped and that she feared for her sister, F, who was still with the rapist in a nearby residence. One of Cummings' companions then called 911. Meanwhile, the defendant urinated in the bedroom closet and lit a cigarette, which he threw onto the floor, before leaving the apartment.

After the authorities received an emergency call reporting the incident at 12:18 a.m. on November 24, 2017, F

and M were transported to Hartford Hospital, where Lourdes Jackson, a sexual assault forensic examiner (SAFE) nurse, evaluated them. In her reports, Jackson noted that both F and M had experienced vaginal tearing, and that M had irritation on the side of her urethra as well. Additionally, Jackson observed contusions on F's back and a large cut or laceration on the right side of M's forehead. Jackson administered sexual assault kits to both F and M.

Two days after Thanksgiving, on November 25, 2017, the police arrived at the defendant's apartment and arrested him. Upon taking the defendant into custody, the police seized the clothing and jewelry he was wearing. The defendant's roommate and former girlfriend, Mary Alvarez, also gave the police clothing that the defendant had worn on Thanksgiving. Three days later, on November 28, 2017, F reviewed a police photographic array and identified the defendant as the perpetrator.

The following additional evidence was presented at trial. The forensic laboratory of the Division of Scientific Services within the Department of Emergency Services and Public Protection analyzed the evidence in this case. Lana Ramos, a DNA analyst at the forensic laboratory, testified about the comparison between known DNA profiles from the defendant and the victims and evidentiary samples taken from the sexual assault kits, swabs of the defendant's clothes and jewelry, and a cigarette butt found in the apartment. She explained that F's and M's DNA profiles were "included"[3] in the DNA profile drawn from the interior front of the defendant's jeans and that M's DNA profile was included in profiles generated from the interior front of the defendant's underpants. Further, F's and the defendant's DNA profiles were both included in the DNA profile drawn from the cigarette butt.

Partial DNA matches[4] were found between M's and F's DNA profiles and the DNA profiles produced from swabs of the defendant's watch and ring. A partial match also was found between the defendant's known DNA profile and one profile generated from genital swabs from M's sexual assault kit.[5] However, the defendant's DNA profile was eliminated from the oral swabs and from other genital swabs from M's sexual assault kit. His DNA profile was also eliminated from the vaginal, oral, and genital swabs from F's sexual assault kit.

Additionally, the state called Jennifer Nelson, a biologist at the forensic laboratory, to testify about the forensic analysis performed in relation to the defendant's case. Nelson testified that the oral swabs from M's sexual assault kit tested positive for the presence of P-30, which is a protein component of semen, and that the genital swabs from M's sexual assault kit tested positive for P-30 and amylase, which is a component of saliva. Further, Nelson said that the vaginal swabs in F's sexual

assault kit likewise tested positive for amylase, and that, when the swabs were transferred to a smear on a microscope slide, spermatozoa were visualized. Nelson further testified that the genital swabs from F's sexual assault kit tested positive for P-30 and for amylase, as did the defendant's underpants.

The state also presented evidence that the defendant was wearing a global positioning system (GPS) monitoring device on his ankle at the time of the incident that transmitted data recording his location. The data revealed that the defendant was at or near the vacant Zion Street apartment beginning at 10:21 p.m. on November 23, 2017, and that he remained in that area until 12:02 a.m. on November 24, 2017.[6] Moreover, the GPS device stopped transmitting its position from 11:23 p.m. on November 23, 2017, until 12 a.m. on November 24, 2017, a phenomenon that could indicate either that the device was unable to pick up a signal during that time or that the defendant had stopped moving. Further, David Aberle, a state officer tasked with monitoring the defendant's location, testified that the defendant did not return home in time to meet his midnight curfew on November 23, 2017.

The defendant's former girlfriend, Alvarez, testified that, on Thanksgiving, the night of the incident, the defendant called her at some point between approximately 11 and 11:45 p.m. and asked for a ride home from his grandmother's house, which also was on Zion Street. When Alvarez arrived at the house, the defendant's sister told her that he had already received a ride home. When Alvarez arrived home after midnight, the defendant was there and he appeared to be "aggravated."

Alvarez further testified that the defendant's behavior and, in fact, his "whole mood" changed, beginning that night. The defendant uncharacteristically asked her if they could work out their relationship problems, began sleeping in her room, rather than alone, and began moving things from his room to hers.

Alvarez also described how, when police officers came to arrest the defendant on November 25, 2017, he called out to her to tell the police that "[they] were together." Alvarez testified that she initially followed the defendant's instruction and told the police that the two had been together on Thanksgiving. Later, she corrected her statement and informed the police that she was not with the defendant that night.

The jury found the defendant guilty on five charges, as described previously.[7] Following his conviction, the defendant entered a guilty plea to being a persistent dangerous felony offender under General Statutes § 53a-40 (a). The trial court rendered judgment in accordance with the verdict and the plea, and sentenced the defendant to, among other things, a total sentence of

fifty years of imprisonment, to run consecutively to any sentence or sentences that the defendant was then serving. Additional facts will be set forth as necessary.

## I

We first consider the defendant's confrontation clause claim, which stems from the testimony of two of the state's witnesses: Ramos, the DNA analyst, and Nelson, the forensic biologist. The defendant argues that Ramos' testimony violated his confrontation rights because Ramos was not involved in generating and had no personal knowledge of certain DNA profiles used in the comparisons about which she testified. He further argues that Nelson's testimony about certain forensic reports violated his confrontation rights because Nelson had no direct involvement in and no personal knowledge of the underlying testing or handling of the samples.

The state argues that defense counsel waived the defendant's confrontation clause claims by failing to object to either expert's testimony at trial and, therefore, that the claims are not subject to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[8] Applying *Golding*, we conclude that the record is inadequate to review the defendant's claim as to Ramos' testimony and that, although the admission of certain portions of Nelson's testimony was improper, that error was harmless.

## A

Certain well established principles govern our consideration of the defendant's claim. "The sixth amendment to the United States constitution, applicable to the states through the fourteenth amendment, provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' U.S. Const., amend. VI." (Footnote omitted.) *State* v. *Walker*, 332 Conn. 678, 689, 212 A.3d 1244 (2019). "In *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. . . . Accordingly, the threshold inquiries in a confrontation clause analysis are whether the statement was hearsay, and if so, whether the statement was testimonial in nature . . . . These are questions of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 689–90.

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the

matter asserted." Conn. Code Evid. § 8-1 (3). "As a general matter, a testimonial statement is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . Although the United States Supreme Court did not provide a comprehensive definition of what constitutes a testimonial statement in *Crawford*, the court did describe three core classes of testimonial statements: [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions [and] . . . [3] statements that were made under circumstances [that] would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Internal quotation marks omitted.) *State v. Walker*, supra, 332 Conn. 700–701. It is undisputed that all of the statements at issue in the present case fall into the third category of testimonial hearsay.

In *Walker*, we applied these principles in the context of laboratory testing. We held that, in order to satisfy the confrontation clause, "at least one analyst with the requisite personal knowledge must testify" about the results of tests performed in anticipation of prosecution. (Internal quotation marks omitted.) Id., 719. With respect to the generation of testimonial DNA profiles, we concluded that "the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are not necessary witnesses. . . . Rather, it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively [served to accuse the] defendant of his role in the crime charged. . . . Accordingly, to satisfy the confrontation clause, the state need only call as a witness an analyst with personal knowledge concerning the accuracy of the numerical DNA profile generated from the preliminary stages of testing." (Citations omitted; internal quotation marks omitted.) Id.

It follows that, for purposes of the confrontation clause, a DNA analyst need not observe the preliminary testing stages in order to testify about the results of a DNA analysis, as long as the analyst has personal knowledge concerning the accuracy of the numerical DNA profile that is ultimately generated. We suggested, in *Walker*, that analysts might attain this personal knowledge by conducting or supervising the testing, by observing the testing being completed, or, in certain cases, by evaluating raw test data to draw their own conclusions. Id., 717–18.

B

Before we address the defendant's confrontation clause claim, we must address the state's argument that the claim has been waived. Specifically, the state contends that the defendant effectively waived his claim when defense counsel (1) failed to object to Nelson's and Ramos' testimony at trial, (2) used portions of the DNA evidence to the defendant's advantage,[9] and (3) moved to admit into evidence the DNA reports, which Ramos authored and relied on for much of her testimony. Because some of the forensic evidence was favorable to the defendant, the state submits, we should assume that defense counsel chose not to object at trial for strategic reasons. We disagree.

Because our decision in *State* v. *Walker*, supra, 332 Conn. 678, had not yet been issued when the present case was tried, the Appellate Court's decision in *Walker* remained binding precedent. See *State* v. *Walker*, 180 Conn. App. 291, 297–307, 183 A.3d 1 (2018), rev'd in part, 332 Conn. 678, 212 A.3d 1244 (2019). In *Walker*, the Appellate Court held that the confrontation clause is not necessarily offended when a laboratory employee who was not involved in preparing a DNA profile testifies that a comparison using that profile implicates the defendant. See id. At the time of trial in the present case, then, defense counsel could not have successfully challenged the testimony of Ramos and Nelson on the ground the defendant raises on appeal, namely, that neither witness had personal knowledge of the results about which they testified.

We have explained that, when the law governing a defendant's constitutional claim has changed after the defendant's trial, counsel acting under binding precedent in effect at the time of the trial cannot make a knowing and intelligent waiver of rights affected by the later decision changing the law. See *State* v. *Culbreath*, 340 Conn. 167, 182–85, 263 A.3d 350 (2021) (involving state constitutional claim); see also id., 184–85 n.7. Because, in the present case, the defendant arguably would not have had a colorable confrontation clause claim under the Appellate Court's decision in *Walker*, defense counsel's failure to object to the testimony of Ramos and Nelson, as well as counsel's attendant choices to highlight whatever support for the defendant's position could be gleaned from their testimony and reports, did not constitute a waiver.

Nevertheless, the defendant does not dispute that his confrontation clause claim went unpreserved at trial, and he seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged

constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate [the] harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Morel-Vargas*, 343 Conn. 247, 253, 273 A.3d 661 (quoting *State* v. *Golding*, supra, 239–40), cert. denied,    U.S.    , S. Ct.    ,    L. Ed. 2d    (2022). "The first two prongs govern whether we may review the claim, [whereas] the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial." *State* v. *Smith*, 289 Conn. 598, 620, 960 A.2d 993 (2008).

C

We first address the defendant's challenge to Ramos' testimony, and we conclude that this challenge is not reviewable under *Golding*'s first prong. Specifically, we agree with the state that the record does not clearly indicate what role, if any, Ramos played in generating the DNA profiles from the defendant's buccal sample, from the known bloodstains of F and M, and from other pieces of evidence about which she testified that tended to inculpate the defendant.

"Under the first prong of *Golding*, for the record to be adequate for review, the record must contain sufficient facts to establish that a violation of constitutional magnitude has occurred. . . . [W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim. . . . As a result, we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 337 Conn. 175, 186–87, 252 A.3d 811 (2020).

The following additional facts are relevant to our analysis. Ramos testified generally about the DNA analytical process and related terminology. Her testimony was that the DNA analyses employed in this case consisted of several distinct steps or processes. First, an analyst or analysts produced DNA profiles from known samples taken from the defendant and the victims. Second, an analyst or analysts generated DNA profiles from various evidentiary items, including samples from M's and F's sexual assault kits and from the defendant's clothing, watch, and ring, as well as from the cigarette butt found in the apartment. Third, an analyst compared the known and evidentiary DNA profiles. Fourth, reports were prepared to explain and present the results of those comparisons.

It is undisputed that Ramos personally performed the third and fourth steps, serving as the examining analyst,

conducting the DNA comparisons, and authoring the reports. It is also clear that she performed some portions of steps one and two with respect to some of the DNA samples. However, the defendant contends that Ramos did not have sufficient personal knowledge of the generation of any DNA profile that tended to inculpate the defendant to permit her to testify about the first two steps.

Our review of the record leads us to conclude that the defendant has failed to establish the extent of Ramos' involvement in or personal knowledge of the process of generating DNA profiles from the known profiles and from all but one of the evidentiary samples. To start, the record is indeterminate as to whether Ramos generated the known DNA profiles from M, F, and the defendant. For example, when the prosecutor asked Ramos if "[she was] able to generate a DNA profile from [a known bloodstain sample from M's sexual assault kit]," Ramos replied that "[a] DNA profile was generated from that bloodstain, yes." The fact that Ramos answered in the affirmative, but phrased her response in the passive voice, creates an ambiguity as to whether it was she who personally generated the sample or, if it was not she, whether she had personal knowledge of its generation. See, e.g., *State* v. *Rodriguez*, supra, 337 Conn. 187–89 (analyst's inconsistent testimony on whether she performed laboratory test made extent of her participation in test unclear); *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 541 n.18, 733 A.2d 197 (1999) (noting that "use of the passive voice create[d] substantial ambiguity"). But cf. *State* v. *Bermudez*, 195 Conn. App. 780, 801, 795–96 n.15, 228 A.3d 96 (2020) (passive voice clearly connoted third-party involvement when witness testified about "[being] relocated"), aff'd, 341 Conn. 233, 267 A.3d 44 (2021). This ambiguity was never clarified.

A similar ambiguity existed when the prosecutor later employed the passive voice to ask whether "a DNA profile [was] generated from the known bloodstain of [F]," to which Ramos replied simply, "[y]es." Similarly, when the prosecutor asked Ramos whether she "[had] a DNA profile" for the defendant when she examined M's sexual assault kit, Ramos replied in the affirmative, without specifying who prepared the profile.[10] Because we are presented with an unclear record, we are unable to determine whether someone other than Ramos generated any of the known profiles and, if so, whether Ramos had personal knowledge of their generation.

Turning our attention to the question of which analyst or analysts generated the DNA profiles from the evidentiary samples, we likewise conclude that the record is too clouded by indeterminate exchanges and/or the use of the passive voice for us to assess whether the work was Ramos' or that of another analyst or analysts and, if the latter, whether Ramos had personal knowledge of

how the profiles were generated. These samples include those drawn from the genital swabs and all but one of the oral swabs from M's sexual assault kit (passive voice), the vaginal, oral, and genital swabs from F's sexual assault kit (indeterminate),[11] a swabbing from the exterior of the defendant's watch (passive voice), a swabbing from the exterior of the defendant's ring (passive voice), a swabbing from the interior front of the defendant's jeans (passive voice), the cigarette butt (indeterminate),[12] a swabbing from the exterior lower front of the defendant's shirt (passive voice), and a swabbing from the exterior lower sleeves and cuffs of the defendant's jacket (passive voice).

We find it especially noteworthy that Ramos affirmatively testified that she was personally involved in the preparation of at least some of the DNA profiles, namely, the vaginal, oral, and genital swabs from F's sexual assault kit, one of the oral swabs from M's sexual assault kit,[13] and certain additional items of evidence listed in a supplemental DNA report.[14] Moreover, in some instances, she testified in the passive voice about the preparation of the samples, even though it was clear that she had been personally involved in generating them. See footnotes 11 and 12 of this opinion. The state of the record prevents us from determining, with any certainty, which samples, if any, were prepared by other analysts and, if any samples were generated by other analysts, whether Ramos had personal knowledge about their preparation through other means. We are therefore unable to evaluate the defendant's confrontation clause claim regarding Ramos' testimony as to the generation of the DNA profiles. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006) ("in the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred"), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Accordingly, we conclude that the defendant's claim regarding Ramos' testimony is not reviewable under *Golding*'s first prong.[15]

D

We next consider the defendant's confrontation clause challenge to Nelson's testimony regarding the forensic evidence in this case. Because the record is adequate to review that claim, which is of constitutional magnitude, we proceed to review the merits of the claim. Although the state concedes that Nelson offered testimonial hearsay, in violation of the confrontation clause, we agree with the state that the claim founders on the fourth prong of *Golding* because the violation was harmless.

1

The following additional procedural history is relevant to this claim. As we discussed, Nelson testified generally about the forensic examination process and

specifically about the presence of substances such as P-30, amylase, and spermatozoa in samples from F's and M's sexual assault kits and the defendant's underpants. She indicated that a single examining analyst produced the forensic reports in this case. Once that analyst had completed the testing and written the reports, Nelson served as the technical reviewer. Her role as the technical reviewer was to "read through all the case notes and [to] look at all the photographs and read through the report[s]" and then to sign the reports if she agreed that the testing and examinations that were performed on the samples involved were satisfactory. In addition to her testimony about the results contained in the forensic reports, Nelson testified about the chain of custody of the various samples involved in the reports.[16]

We need not linger long on the third prong of *Golding* because the state concedes that, pursuant to this court's decision in *Walker*, only the examining analyst or another witness with the requisite personal knowledge could testify regarding the results of the forensic reports. See *State* v. *Walker*, supra, 332 Conn. 717–19. When Nelson testified to the results of those reports, she "explicitly referred to, relied on, and vouched for the quality of work that she did not perform and, in so doing, relayed to the jury [the forensic examining analyst's] out-of-court statements . . . ." Id., 697. Moreover, the statements clearly were offered for their truth, and the forensic examining analyst in this case reasonably could have expected that the findings he or she generated would later be used for prosecutorial purposes. See, e.g., *Bullcoming* v. *New Mexico*, 564 U.S. 647, 658–59, 665, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *State* v. *Walker*, supra, 711. Accordingly, the defendant had a sixth amendment right to cross-examine the authoring analyst regarding the reports, which was violated here.[17]

2

Having found a violation of the defendant's sixth amendment rights under *Walker*, we proceed to the fourth prong of *Golding*. Constitutional violations implicating the confrontation clause are subject to harmless error analysis. *State* v. *Baltas*, 311 Conn. 786, 805, 91 A.3d 384 (2014). In the present case, the state contends, and we agree, that it has satisfied its burden of establishing that the violation was harmless beyond a reasonable doubt.

"In undertaking this analysis, the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have

had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Edwards*, 334 Conn. 688, 706–707, 224 A.3d 504 (2020).

In this case, Nelson's improper testimony was just one tile in a mosaic of evidence that the state presented to prove the defendant's guilt beyond a reasonable doubt. This evidence centered around two major issues: (1) whether a crime occurred on the night of Thanksgiving, 2017, and (2) if so, whether the defendant was the person who committed that crime.

Anchoring the state's case on the first issue was the trial testimony of F, who related, in great detail, how the defendant had entered the vacant apartment and repeatedly sexually assaulted her and M. F's statements to the SAFE nurse, Jackson, on the morning after the incident, and to the police, five days after the incident, corroborated many aspects of her trial testimony.[18] Jackson's testimony and her examination report further corroborated F's story. Jackson described, for instance, injuries that F had sustained, including contusions on her back and vaginal tears, that were consistent with a sexual assault. Jackson also noted, during her testimony and in her report, that M had sustained a large cut or laceration on the right side of her forehead, among other injuries. This was consistent with F's testimony that the defendant had struck M with his gun on the right side of her forehead. Jackson's observations of four tears in M's vaginal tissue, as well as irritation on the side of M's urethra, lend further credence to F's account of the incident.

Cummings' testimony also provided strong support for the allegation that F and M had been sexually assaulted on the night in question. He described how M ran up to him on the street half-dressed and told him that she had been raped and that her sister, F, remained in danger. This was consistent with F's description of M running naked out of the apartment.

With respect to the second issue, namely, whether it was the defendant who committed the crimes that F described, the state offered a variety of evidence to support its argument that he was, in fact, the perpetrator. First, there was F's identification of the defendant in a police photographic array, five days after the incident. Second, there was F's statement to the police describing the perpetrator as having colored dreadlocks,[19] consistent

with surveillance video footage of the defendant taken two days after the incident. In the same statement, F described the defendant as wearing clothes on the night of the incident that closely matched the clothing that Alvarez provided to the police.

Third, the state presented Ramos' testimony about the DNA analysis performed in this case, which was especially incriminating in that it confirmed that the defendant had been in physical contact with the victims. In particular, Ramos testified that both M's and F's DNA were included on the interior front of the defendant's jeans, that M's DNA was included on the interior front of the defendant's underpants, and that both the defendant's and F's DNA were included on the cigarette butt found in the apartment. Ramos explained that the designation of a DNA profile as "included" denotes a "full match," which is the highest level of positive association between known and evidentiary DNA samples. Ramos quantified the strength of these results in her reports and her testimony. She indicated that, given the specified parameters, it was at least 100 billion times more likely that the DNA found on the defendant's jeans originated from F and M than from unknown individuals. Ramos also indicated that it was at least 100 billion times more likely that the DNA found on the defendant's underpants originated from M than from an unknown individual. It was equally likely, she opined, that the defendant contributed to the DNA found on the cigarette butt in the apartment.

Ramos further testified that F's and M's DNA profiles could not be eliminated from samples taken from the defendant's watch and ring and that the defendant's DNA profile could not be eliminated from certain genital swabs from M's sexual assault kit. Ramos explained that the designation "cannot be eliminated" indicates a "strong positive association" between an evidentiary profile and a known profile and is "similar to a partial match." She testified, for example, that, assuming the specified parameters, it was at least eleven million times more likely that the defendant, rather than an unknown individual, contributed to the DNA profile resulting from the testing of the epithelial-rich fraction of the genital swabs taken from M's sexual assault kit. It is difficult to imagine that this evidence left the jury with a reasonable doubt that the defendant was present in F's apartment on the night in question and that he engaged in intimate contact with the victims.

Fourth, various independent sources placed the defendant at or near the crime scene around the time of the assaults. The state produced evidence that the Hartford Police Department received a call at 12:18 a.m. on November 24, 2017, reporting a possible sexual assault victim in the area of Zion Street. That call sets a time frame that is consistent with F's statement to the police that the assaults occurred late at night, on

November 23, 2017. With respect to the defendant's whereabouts during that critical period of time, the state offered (1) Aberle's testimony that the defendant did not make it home by his mandated midnight curfew on November 23, 2017, (2) the GPS tracking data from the defendant's ankle monitor, reflecting that he was at or near the vacant apartment between 10:21 p.m. on November 23, 2017, and 12:02 a.m. on November 24, 2017, and (3) Alvarez' testimony describing the call that she received from the defendant asking for a ride home, that the defendant's sister told Alvarez that the defendant already had received a ride home when Alvarez arrived to pick him up at the house of the defendant's grandmother on Zion Street, and that Alvarez found the defendant in their apartment upon her return after midnight. Particularly in light of the GPS data, the jury could not reasonably have questioned that the defendant was at or near the vacant Zion Street apartment at the time of the assaults.

Finally, the state presented evidence of the defendant's consciousness of guilt. The most incriminating aspect of this evidence was that, when police officers came to arrest the defendant, he instructed Alvarez to lie to the police by telling them that they had been together.

In light of this substantial and strong body of evidence showing that the charged crimes were committed and that the defendant was the perpetrator—and particularly considering the weighty DNA and GPS evidence—we conclude that the state's case against the defendant was compelling, even without the portions of Nelson's testimony that were admitted in error. At best, Nelson's testimony established that the defendant and the victims each had engaged in recent sexual activity but not with any particular partners. Given that the prosecutor made only a passing reference to Nelson's findings in her closing argument, noting that Nelson had identified indicators of semen in M's and F's respective sexual assault kits, and given that those findings were cumulative of the more specifically incriminating DNA evidence, we conclude that Nelson's findings were of minimal importance to the state's case. The defendant's claim challenging Nelson's testimony therefore fails to satisfy the fourth prong of *Golding*.

II

We next address the defendant's argument that the trial court improperly rejected his claim, first raised in a supplemental motion for a new trial, that the state violated his due process rights by failing to correct false or misleading trial testimony. The defendant argues, among other things, that F gave misleading testimony when she denied having asked the state for assistance with her pending criminal case and that another witness, Gerald Kumnick, an inspector employed by the Division of Criminal Justice, testified falsely when he

represented that the state had made no offers or promises to F.

The state argues that F's testimony was not substantially misleading but acknowledges that she may have thought the state had implicitly offered her a benefit when the prosecutor agreed to inform the prosecutor handling her pending criminal case that F hoped to get into a sobriety program. The state concedes that it should have corrected Kumnick's testimony but contends that any error was harmless. We agree with the state and, therefore, conclude that the trial court did not abuse its discretion in denying the defendant's supplemental motion for a new trial.

## A

The following additional procedural history is relevant to this claim. On May 16, 2019, the prosecutor and her investigator, Kumnick, met with F (pretrial meeting). During the pretrial meeting, F—who was the defendant in a separate, part B criminal case being handled by another prosecutor (part B prosecutor)—mentioned that "she hope[d] to be able to go to a program that [would] help her with maintaining sobriety, job skills, and housing."[20] In response, the prosecutor told F that she would "mention to the [part B] prosecutor handling [F's case] that [F was] a victim in the [present] case [and] that she was hoping [to enter] the program."

On May 22, 2019, one week before trial began, the prosecutor emailed defense counsel in this case to inform him about the pretrial meeting. In the email, the prosecutor explained that "[F] has mentioned during our discussions that she hopes to be able to go to a program that will help her with maintaining sobriety, job skills, and housing. I have made no promises but did indicate I would mention to the [part B] prosecutor handling [F's case] that she is a victim in a [p]art A case and that she is hoping for entry [in]to a program that can help with maintaining sobriety, job skills, and provide temporary housing."

At trial, defense counsel asked F, on cross-examination, whether she had ever asked the state's attorney's office for help with her pending criminal case. F indicated that she had not.[21] Following this testimony, and outside the presence of the jury, the prosecutor described the pretrial meeting to defense counsel and the trial judge. She indicated that Kumnick, who was present at the pretrial meeting, could be made available to testify, if needed, regarding the circumstances of the meeting. The trial court said: "Well, we'll cross that bridge if we get to it."

Later in the trial, the prosecutor did call Kumnick as a witness and, on direct examination, asked him if F had asked for anything during the pretrial meeting. Kumnick replied that she had not.[22] The prosecutor further asked whether F had requested that the state "endeavor to

find [F] a program in any way," and Kumnick responded that, "[s]urprisingly," F had not. Kumnick did acknowledge, however, that "F made a statement [during the pretrial meeting] that she wished that she could be involved in some sort of program to help her become and stay sober." The prosecutor further inquired of Kumnick whether there "[w]ere any offers made to [F] [during the pretrial meeting]" and whether there "[w]ere any promises made to [F] [during the pretrial meeting]." To both questions, Kumnick replied, "[n]one."

Thereafter, during closing argument, the prosecutor highlighted Kumnick's testimony for the jury as showing that F had no ulterior motive to testify against the defendant.[23] At no point did defense counsel object to F's or Kumnick's testimony regarding the pretrial meeting on the grounds that that testimony was false or substantially misleading. Defense counsel also declined to cross-examine Kumnick. Following the trial, the defendant filed a supplemental motion for a new trial, arguing that his due process rights had been violated by the state's presentation of false testimony at trial. The trial court denied the motion.

B

Certain well-defined legal principles govern our consideration of the defendant's claims. "Whether a prosecutor knowingly presented false or misleading testimony [in violation of a defendant's due process rights] presents a mixed question of law and fact, with the [trial] court's factual findings subject to review for clear error and the legal conclusions that the court drew from those facts subject to de novo review." *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 14, 190 A.3d 851 (2018), cert. denied sub nom. *Greene* v. *Semple*, U.S. , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019). Ultimately, however, a trial court's decision to grant or deny a motion for a new trial is reviewable for abuse of discretion. See, e.g., *State* v. *Smith*, 313 Conn. 325, 348, 96 A.3d 1238 (2014).

In addition, "[d]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . If a [state] witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* [v. *United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)] and *Napue* [v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)] require the prosecutor to apprise the court when he or she knows that the witness is giving testimony that is substantially misleading." (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 175, 243 A.3d 1163 (2020).

"To establish a *Napue/Giglio* violation, then, the

[defendant] must demonstrate that the state's witnesses provided material, false or substantially misleading testimony that the prosecutor failed to correct." Id., 176. We have emphasized, in this respect, that "*Giglio* and *Napue* do not apply to merely misleading testimony . . . . Rather, those cases require the prosecutor to correct *only* testimony that is substantially misleading or false." (Emphasis in original; internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, supra, 330 Conn. 24–25. The phrase " 'substantially misleading' " describes testimony that, although made in good faith, is untrue in a manner that should be obvious to the state. Id., 25. False testimony, by contrast, occurs when the prosecutor knows that a state witness has committed perjury. See id.

Finally, "[w]hether the prosecutor's presentation of false or substantially misleading testimony constitutes a due process violation depends on whether the evidence at issue is material. In contrast to conventional *Brady* [v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] claims, [w]hen . . . a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial [impropriety], but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . *unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. . . .*

"In accordance with these principles, our determination of whether [the witness'] false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which [the defendant was] otherwise able to impeach [the witness]. . . . [D]etermining materiality presents a question of law subject to plenary review." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Komisarjevsky*,

338 Conn. 526, 646–47, 258 A.3d 1166, cert. denied,
U.S.    , 142 S. Ct. 617, 211 L. Ed. 2d 384 (2021).

## C

We turn now to the merits of the defendant's claim. Our task is simplified by the state's acknowledgment that, even though F's trial testimony may not have been literally false, insofar as she never expressly asked the prosecutor for help with her pending criminal case; but see footnote 20 of this opinion; the prosecutor did offer F what could be viewed as a benefit during the pretrial meeting. Specifically, "[t]he state acknowledges that a person in F's position may have believed that she could benefit from the prosecutor's 'promise' . . . that she would tell [the part B] prosecutor, who was handling F's . . . case, that F was a victim in a part A case and [was] looking for entry into a substance abuse and/or job program."

### 1

We first consider F's testimony regarding the pretrial meeting, beginning with the question of whether that testimony was false or substantially misleading. As we discussed, defense counsel asked F if she had sought help from the state with her pending part B criminal case. F denied ever doing so. This may have been technically true. In context, however, F's statement at the pretrial meeting that, in the prosecutor's words, "she hope[d] to be able to go to a program that [would] help her with maintaining sobriety, job skills, and housing," or, in Kumnick's words, she "wished" to enter a sobriety program, suggests that she was implicitly asking for the state's assistance, at minimum, with her drug problem and, potentially, with her criminal case as well. See, e.g., *Harrington* v. *Freedom of Information Commission*, 323 Conn. 1, 16–17, 144 A.3d 405 (2016) (recognizing implicit or implied requests for legal advice); see also, e.g., *People* v. *Moore*, 50 Cal. App. 3d 989, 993, 123 Cal. Rptr. 837 (1975) (recognizing defense counsel's act of relaying certain information to prosecutor as "implied request" for prosecutor to interview certain witnesses). The fact that the prosecutor responded by agreeing to mention F's interest in entering a sobriety program to the part B prosecutor supports the defendant's interpretation that the prosecutor assented to an implied request. F's testimony denying having made any requests of the state can, therefore, reasonably be read as misleading.

To be deemed *substantially* misleading, however, F's testimony must have been untrue in a manner that would have been obvious to the prosecutor. See, e.g., *Greene* v. *Commissioner of Correction*, supra, 330 Conn. 25. We cannot conclude that it rises to that level, insofar as F did not expressly ask the state for any help with her pending criminal case during the pretrial meeting.

Moreover, we agree with the trial court that any

tendency of F's testimony to mislead was cured when the prosecutor elicited Kumnick's testimony that F had expressed her wish to enroll in a sobriety program during the pretrial meeting. As a result, the jury was made aware that F had informed the prosecutor of her desire to get into a sobriety program prior to testifying at the defendant's trial. Accordingly, we do not think that F's testimony regarding her implicit request for assistance with drug treatment and job training during the pretrial meeting was so substantially misleading that the prosecutor was under a legal obligation to correct it.

### 2

We next turn our attention to Kumnick's testimony regarding the pretrial meeting. Once again, our task is simplified because the state acknowledges that his testimony should have been corrected. Specifically, the state agrees that, "after Kumnick testified that the state had made no promises to F, the prosecutor should have elicited testimony about what she had told F she would tell the part B prosecutor." We understand this to be an acknowledgment that Kumnick's testimony on that point was potentially substantially misleading. That is, his testimony, although presumably made in good faith, was untrue in a manner that should have been obvious to the state and, thus, should have been corrected.[24]

Although the state acknowledges that the prosecutor should have corrected Kumnick's testimony, it argues that her disclosures to defense counsel and to the trial court regarding the pretrial meeting were sufficient to satisfy due process. We disagree.

To assess "whether the state has satisfied its obligations under *Napue* [and *Giglio*] merely by disclosing to defense counsel that a witness for the prosecution has given material, false testimony," we consider a number of factors. *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 185. "Those factors include [1] whether it is the prosecution or the defense that elicits the false testimony, [2] whether and how the prosecutor adopts and uses the false testimony, [3] the importance of the witness and his or her false testimony to the state's case, [4] whether—and to what effect—defense counsel tries to impeach the perfidious witness or whether counsel has a clear tactical reason for not doing so, and, most important, [5] whether the truth ultimately is revealed to the jury." Id. In the present case, all of the *Gomez* factors point to the conclusion that disclosure to the trial court and to defense counsel was not sufficient to cure Kumnick's misleading testimony.

First, it was the prosecutor who elicited the substantially misleading testimony from Kumnick on direct examination, albeit in an attempt to clarify F's potentially misleading testimony. Second, the prosecutor, who believed that she had made no formal promises to F,

used Kumnick's testimony that the state had made no promises to F to the state's advantage in her closing argument, by emphasizing that F had no ulterior motive to testify against the defendant. Third, although Kumnick was not a key witness, his testimony was important to the state's case, insofar as it bolstered the credibility of F, who was the state's central witness.[25] Fourth, the truth was not brought to the attention of the jury by defense counsel.[26] Fifth, and most important, the truth was never ultimately revealed to the jury. That is, the jury was never told that the prosecutor offered to tell the part B prosecutor that F wanted to enter a drug treatment program. All five factors of the *Gomez* test thus indicate that the prosecutor did not fulfill her responsibility under *Napue* and *Giglio*, notwithstanding her disclosures to defense counsel.

Having determined that the state presented and did not correct Kumnick's substantially misleading testimony, we now must consider whether that testimony was material, such that reversal of the defendant's conviction is required. We conclude that it was not.

To be sure, the state's failure to correct Kumnick's testimony prevented the jury from accurately gauging both his and F's credibility. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 190, 989 A.2d 1048 (2010) ("[o]nly through complete and candid disclosure of a witness' interest can the jury accurately gauge the credibility of the testimony proffered"). Kumnick's credibility itself was largely immaterial. The state's examination of Kumnick was brief and focused entirely on the state's pretrial meeting with F; there was no cross-examination. Kumnick thus helped to bolster F's credibility, but his testimony was tangential to a determination of the defendant's guilt. There is no reason to believe that the result of the defendant's trial would have been different had the jury determined that Kumnick lacked credibility.

F, by contrast, was an important witness whose testimony anchored the state's case. Had the jury known of F's implicit potential inducement to testify, it may have taken a more skeptical view of her testimony, at least to some extent. See, e.g., *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 387, 71 A.3d 512 (2013) (noting that witness who is promised benefit in return for testimony has "powerful incentive, fueled by self-interest, to implicate falsely the accused" (internal quotation marks omitted)). We therefore must consider the strength of the state's case in the absence of F's trial testimony.

As we discussed in part I B of this opinion, the state had presented strong, independent evidence of the defendant's guilt. M informed Cummings that she and her sister, F, had been sexually assaulted. Jackson observed physical injuries consistent with that account. Aberle, Alvarez, and the GPS evidence all placed the defendant in the area of the sexual assaults around the time that

they occurred. The state's DNA evidence was particularly incriminating, demonstrating to a high degree of probability that the defendant had been present in F's apartment and had engaged in intimate contact with both F and M. The consciousness of guilt evidence reinforced the state's case against the defendant.

In addition, even if the jury had questioned the credibility of F's trial testimony incriminating the defendant, there would have been no cause to doubt the veracity of her prior statements, which largely corroborated that testimony and preceded any possible inducement. See, e.g., *Daley* v. *McClintock*, 267 Conn. 399, 414, 838 A.2d 972 (2004) ("[a] consistent statement, [made] at a time prior to [the suggested time of contrivance] will effectively explain away the force of the impeaching evidence . . . because it is thus made to appear that the statement in the form now uttered was independent of the discrediting influence" (internal quotation marks omitted)). Among these prior statements were F's statement to Jackson, the SAFE nurse, shortly after the incident, and her statement to the police, five days after the incident. See footnote 18 of this opinion. Both statements recounted how a man entered F's apartment, prevented F and M from leaving the bedroom, physically assaulted M, and sexually assaulted both F and M. Accordingly, any argument that F's expectation that the prosecutor would inform F's part B prosecutor that F desired to enter a sobriety program had motivated F to falsely accuse the defendant would have been severely undermined by the fact that F already had made substantially consistent allegations of sexual assault well before any such deal existed.

Further supporting F's account of the incident, outside of her trial testimony, were her identification of the defendant in a photographic array and her description of the defendant, in her statement to the police, as having colored dreadlocks, consistent with images captured of him within two days of the incident, and as wearing clothes matching those provided by Alvarez. All of this evidence coalesces into a formidable case against the defendant that stands independent of the trial testimony of Kumnick and F.

We very much doubt, however, that the jury would have fully discredited F's trial testimony simply because the state had agreed to inform the part B prosecutor that F was interested in entering a sobriety program. F was not a coconspirator or jailhouse informant, either of whom may require an inducement in order to testify for the state and may be thought to be especially amenable to providing false testimony in exchange for such an inducement. As an alleged victim of the charged crime, F may be assumed to have had an inherent motivation to testify at trial simply "to see that justice is done . . . ." *State* v. *Gunther*, 39 Conn. Supp. 504, 507–508, 466 A.2d 804 (App. Sess. 1983); see also, e.g., *Adams*

v. *Commissioner of Correction*, supra, 309 Conn. 386 (recognizing that witness' status as victim was part of his "reason to testify against his assailants wholly apart from any promise of leniency").[27]

In addition, the jury likely would have considered the nature and scale of the potential inducement when weighing any incentive F had to testify falsely. See, e.g., *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 386–87. In this respect, we agree with the finding of the trial court that the inducement at issue fell far short of, for example, recommending leniency to a sentencing court as part of a formal cooperation agreement. The prosecutor made no formal promises to F and never discussed providing any benefits in exchange for F's testimony but, rather, merely offered to inform another prosecutor of F's interest in entering a sobriety program.

We further note that the jury had little difficulty finding the defendant guilty of five of the six charged counts, reaching a verdict in a matter of hours, despite the fact that F's credibility *was* called into question in various ways. For instance, defense counsel obtained a stipulation from the state that F's statement to the police was inconsistent with her trial testimony, as it left out that the defendant had ordered her to kill M at one point. Defense counsel further impeached F's credibility by eliciting from her that she paid no rent for the vacant apartment that she occupied at the time of the incident, had no job, used drugs, and was in prison at the time of trial. And counsel highlighted the conflict between (1) F's statement to Jackson that she had not engaged in any other intercourse over the prior 120 hours, and (2) DNA reports indicating that an individual other than the defendant contributed to the sperm-rich fraction collected from F's vaginal swabs. Indeed, the truthful testimony that Kumnick provided—that F did, in fact, say that she was interested in entering a sobriety program—could be understood to cast doubt on the credibility of F's trial testimony, suggesting that she had misleadingly concealed her implied request for the state's assistance.

Lastly, the fact that the jury found the defendant not guilty on one of the six counts shows that the jury was able to assess F's credibility independently of the influence of Kumnick's substantially misleading testimony. See, e.g., *State* v. *Ciullo*, 314 Conn. 28, 60, 100 A.3d 779 (2014) (holding that split verdict "clearly demonstrat[ed] the jurors' ability to filter out the allegedly improper statements and make independent assessments of credibility"). Specifically, there had been evidence presented at trial, including F's testimony, that the defendant had stolen two cell phones during the assaults. The state charged the defendant with one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). The jury found the defen-

dant not guilty on that count. We thus observe that the jury must have filtered F's testimony, declining to credit her account of the alleged thefts.

In short, the facts that the state's case against the defendant was so overwhelming, that F's testimony was corroborated by her own prior statements and other sources, that her potential inducement to testify falsely was limited, and that the jury reached a verdict so quickly, even in the face of other impeachment evidence, satisfy us that Kumnick's misleading testimony was not material to the result. We thus conclude that the defendant has failed to prove a violation of his constitutional right to due process and conclude that the trial court did not abuse its discretion in denying his supplemental motion for a new trial.

### III

After trial, the defendant filed a motion for a new trial, claiming that his right to a fair trial was violated because witnesses referred to F and M as "victims" during the trial. The trial court denied that motion. On appeal, the defendant renews that claim and asserts that, when the prosecutor and five trial witnesses referred or alluded to F and M as victims, they violated his right to a fair trial, as secured by the fourteenth amendment to the federal constitution, because a primary issue in the trial was whether any crime had, in fact, been committed. We conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial on that basis.

We begin by setting forth the relevant standards of review. With respect to alleged prosecutorial impropriety, it is well established that, "[if] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . . The defendant also has the burden to show that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Brett B.*, 186 Conn. App. 563, 573, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019); see also, e.g., *State* v. *McCoy*, 331 Conn. 561, 571–72, 206 A.3d 725 (2019) (setting forth standards that govern claims of prosecutorial impropriety).

By contrast, when a witness has expressed an opinion on an ultimate issue to be decided by the jury, such as whether a complainant is in fact the victim of a crime, in violation of § 7-3 (a) of the Connecticut Code of Evidence, the failure of the trial court to strike that testimony is reviewed for abuse of discretion. See, e.g., *State* v. *Iban C.*, 275 Conn. 624, 634–36, 881 A.2d 1005 (2005); see also, e.g., *In re Investigatory Grand Jury No. 2007-04*, 293 Conn. 464, 478 n.8, 977 A.2d 621 (2009)

(determination regarding extent to which pretrial publicity had prejudicial effect on defendant's fair trial rights is ordinarily reviewable for abuse of discretion).

"[I]n [*State* v. *Warholic*, 278 Conn. 354, 370, 897 A.2d 569 (2006)], this court held that a *prosecutor's* reference to the complainant as the victim was not necessarily inappropriate because the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes. . . . This court caution[ed] the state, however, against making excessive use of the term victim to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 54–55.

In the present case, the defendant challenges the use of the term "victim" by five witnesses and the prosecutor. Specifically, the prosecutor used the term once to refer to F during her direct examination of Detective Ivette Berrios. In addition, Jackson used the term five times during her testimony, Berrios used the term three times, Officer Victor Ortero used the term twice, Ramos used the term three times, and Kumnick used the term once.

We begin our analysis with the prosecutor's use of the term "victim." The defendant challenges the prosecutor's sole use of the term during the direct examination of Berrios.[28] This court and the Appellate Court repeatedly have concluded that a prosecutor's infrequent use of the term "victim" does not constitute prosecutorial impropriety. See, e.g., *Donald G.* v. *Commissioner of Correction*, 203 Conn. App. 58, 71, 247 A.3d 182 (citing cases), cert. denied, 337 Conn. 907, 253 A.3d 45 (2021); see also, e.g., *State* v. *Warholic*, supra, 278 Conn. 370 (prosecutor's reference to complainant as "victim" on two occasions did not amount to impropriety); *State* v. *Williams*, 200 Conn. App. 427, 438, 238 A.3d 797 (prosecutor's relatively infrequent use of term did not constitute impropriety), cert. denied, 335 Conn. 974, 240 A.3d 676 (2020); *State* v. *Kurrus*, 137 Conn. App. 604, 621, 49 A.3d 260 (prosecutor's reference to complainant as "victim" on three occasions did not unduly influence jurors), cert. denied, 307 Conn. 923, 55 A.3d 566 (2012); *State* v. *Rodriguez*, 107 Conn. App. 685, 701, 703, 946 A.2d 294 (prosecutor's sporadic use of term did not amount to impropriety), cert. denied, 288 Conn. 904, 953 A.2d 650 (2008).

On the other hand, when a prosecutor's references to a complainant as a "victim" are "prevalent and chronic, [our appellate courts] have determined that such references have invaded the propriety of the trial proceed-

ing." *Donald G.* v. *Commissioner of Correction*, supra, 203 Conn. App. 71; see, e.g., *State* v. *Thompson*, 146 Conn. App. 249, 270–72, 76 A.3d 273 (prosecutor's use of word "victim" on seven occasions, necessitating repeated court intervention, was inappropriate), cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013); *State* v. *Albino*, 130 Conn. App. 745, 762, 24 A.3d 602 (2011) (when there was challenge as to whether crime occurred, repeated use of word "victim" was improper), aff'd, 312 Conn. 763, 97 A.3d 478 (2014). In the present case, we cannot conclude that the prosecutor's single use of the term "victim" was improper, particularly in light of the fact that she used the term only in an attempt to clarify Berrios' testimony.

The defendant also challenges fourteen uses of the term "victim" by various witnesses. Two witnesses, Berrios and Ortero, directly referred to F and/or M as "victim(s)." Other witnesses, namely, Jackson, Ramos, and Kumnick, used the term when they referred more generally to their work involving victims of sexual assault. Even if we were to assume that each of these uses of the term "victim" by the state's witnesses was improper, we cannot conclude that the defendant satisfied his burden of demonstrating that those improprieties were so egregious as to amount to a denial of due process.

At the outset of the trial, the trial court emphasized to the jurors that they would be solely responsible for determining the credibility of the witnesses who would be presented. Subsequently, on three separate occasions during trial, the court issued curative instructions, directing the jury to disregard the witnesses' use of the term "victim."[29] The court further ordered that F not be called "victim," an order that the prosecutor explicitly affirmed in front of the jury.[30] Moreover, when defense counsel objected to Ramos' use of the term, the court sustained the objection and ordered that testimony stricken from the record.

Finally, the trial court added an additional curative instruction to its jury charge.[31] The Appellate Court repeatedly has held, and we agree, that curative instructions mitigate the potential harm of the use of the term "victim." See, e.g., *State* v. *Williams*, supra, 200 Conn. App. 437–38; *State* v. *Thompson*, supra, 146 Conn. App. 274–75; *State* v. *Vilchel*, 112 Conn. App. 411, 441, 963 A.2d 658, cert. denied, 291 Conn. 907, 969 A.2d 173 (2009). We presume that, in the absence of an indication to the contrary, a jury has followed a trial court's curative instructions. E.g., *State* v. *Holley*, 327 Conn. 576, 629, 175 A.3d 514 (2018).

We thus conclude that the jury's obligation to determine the credibility of witnesses independently in reaching its verdict was made sufficiently clear that the defendant's right to a fair trial was not compromised. The fact that the jury found the defendant not guilty on the first degree robbery charge reinforces this con-

clusion. See, e.g., *State* v. *Ciullo*, supra, 314 Conn. 60. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] See General Statutes § 51-199 (b) (3).

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[3] Ramos testified that, when a DNA profile is designated as "included," it denotes a "full match," the highest level of positive association between known and evidentiary DNA samples.

[4] We use this terminology as a shorthand for the forensic laboratory's designation of a DNA sample that "cannot be eliminated" from a tested sample. Ramos explained that the designation "cannot be eliminated" indicates a "strong positive association" between an evidentiary profile and a known profile, and is "similar to a partial match."

[5] Specifically, the defendant's DNA profile could not be eliminated from the epithelial-rich fraction of the genital swabs from M's sexual assault kit.

[6] The data points captured within this period were accurate to between six and forty-three meters.

[7] The state also charged the defendant with one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) based on the allegation that, during the incident, he stole cell phones belonging to F and her romantic partner. The jury found the defendant not guilty on that count.

[8] The question of whether and to what extent unpreserved claims alleging violations of *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), are subject to *Golding* review is currently pending before this court. See *State* v. *Robles*, Docket No. SC 20452 (argued October 18, 2022). As we discuss hereinafter, given the unique circumstances of the present case, in which the governing law changed after the case was tried, we conclude that the defendant's claim was not waived. Thus, we assume, for purposes of this case, that *Golding* applies to the defendant's *Crawford* claim.

[9] During closing argument, for example, defense counsel told the jury that, "if you carefully look at the evidence, the most damaging evidence to the state's case is the DNA forensic evidence."

[10] In later exchanges concerning the defendant's DNA profile, Ramos repeated her initial, vague response. The DNA reports that defense counsel introduced into evidence do little to elucidate the genesis of the defendant's DNA profile, stating only that "DNA was previously extracted and analyzed" from the defendant's buccal sample and referring the reader to a supplemental report that was never admitted into evidence.

[11] The prosecutor asked Ramos whether DNA profiles *were generated* from the vaginal, oral, and genital swabs from F's sexual assault kit, and Ramos responded in the affirmative. Later, Ramos said that she "believed [she] processed [the vaginal and oral swabs from F's sexual assault kit] for DNA . . . ." Ramos further confirmed that she "look[ed] at the genital swabs from [F's sexual assault kit] . . . [f]or DNA" but then said that those swabs "were processed [for DNA] . . . ." Defense counsel did not follow up to resolve the ambiguities in this testimony.

[12] The prosecutor asked Ramos if, in relation to the cigarette butt, she was "able to generate a DNA profile from the samples sent to [the] DNA [section of the forensic laboratory] from forensic biology." In response, Ramos testified that "[a] DNA profile was obtained from that item, yes." Defense counsel subsequently asked Ramos: "[O]n the cigarette butt you examined, or the samples from the cigarette butt, you have a mixture of three individuals on that, correct?" To this, Ramos replied, "[c]orrect." Once again, these exchanges create ambiguity regarding Ramos' personal involvement.

[13] Ramos confirmed that she had "obtained a DNA profile" for item 1EB, which was a sperm-rich fraction of the oral swabs from M's sexual assault kit.

[14] The additional items included various samples of stains from the defendant's underpants, a sample of a stain from the exterior front right side of the defendant's jacket, and the cigarette butt sample. Ramos testified that she "believe[d] [that she] tested some of [those items] and [that] another DNA analyst did the laboratory processing for some of them."

[15] We have considered the defendant's other arguments regarding the admissibility of Ramos' testimony and find them to be without merit. For example, the defendant has asked that we take judicial notice of the transcripts in other cases that, the defendant argues, indicate that, under the forensic laboratory's standard operating procedures, different analysts generate the DNA profiles from known DNA samples than from evidentiary samples. We decline the invitation. See, e.g., *State* v. *Siano*, 20 Conn. App. 369, 375, 567 A.2d 1231 (1989) (Appellate Court declined to take notice of factual record of other case when that record was in dispute and was not brought to attention of trial court), aff'd, 216 Conn. 273, 579 A.2d 79 (1990).

[16] She testified, for example, that various items from the victims' sexual assault kits were forwarded to the DNA section of the forensic laboratory for further testing.

[17] Because we conclude that Nelson's testimony regarding the forensic results violated the defendant's confrontation rights, we need not determine whether her testimony regarding the chain of custody of the samples that were evaluated in those reports represented an independent constitutional violation. Specifically, we need not resolve the parties' disagreement over whether and when a defendant has the right to cross-examine the various individuals involved in the chain of custody of a laboratory sample.

[18] For example, F informed the police that, among other things, a man with a black revolver entered their bedroom, swore at them, ordered them to disrobe, started hitting M, and raped both F and M repeatedly. The man also forced them to engage in cunnilingus, forced M to fellate him, struck M in the face with the revolver, and urinated in the closet. Finally, he told one of two other men who entered the apartment to rape F.

[19] In F's statement to the police, she described the defendant's dreadlocks as having "some orange color," whereas she testified at trial that they had a "reddish color."

[20] There is no transcript of this pretrial meeting, and our understanding of what was said derives entirely from the prosecutor's subsequent, brief synopsis of the meeting and from Kumnick's trial testimony. We proceed on the assumption that the prosecutor has accurately characterized F's statements and that F never expressly requested any assistance from the state. Nevertheless, we caution the state to always remain vigilant regarding its duty to correct substantially misleading testimony regarding any benefits offered to its witnesses.

[21] Specifically, defense counsel had the following exchange with F:

"[Defense Counsel]: And you asked the [prosecutor] to help you with this other case that you're in prison for, correct?

"[F]: No.

"[Defense Counsel]: You didn't ask her for any help?

"[F]: No.

"[Defense Counsel]: You didn't ask her for help with your drug addiction?

"[F]: No.

"[Defense Counsel]: You didn't ask her if she would help you with job training?

"[F]: No."

Later, on recross-examination, defense counsel had the following exchange with F:

"[Defense Counsel]: So, [because] the state found you, you're saying that you never asked the [prosecutor], or anybody with the [prosecutor], for help with your other case, correct?

"[F]: No."

[22] The prosecutor again asked: "[F] made no requests?" Kumnick replied, "[n]one."

[23] The prosecutor argued: "And, finally, Inspector Kumnick testified before you. . . . Kumnick testified that, yes, the state's attorney's office does meet with witnesses, they do meet with them before [the witnesses] go on the stand and . . . I believe the word [he] used was, 'surprisingly,' there was no request, there was no request for a halfway house or a program or any request of our office. [F] met with us, she talked with us, and then she came here and she testified. She took the oath to tell the truth, the whole truth, nothing but the truth, and testified before you."

[24] We conclude that Kumnick's statement is substantially misleading, rather than false, because the record is clear that neither the prosecutor nor Kumnick understood the prosecutor's statement to F to be a formal "promise" of assistance with her pending case.

[25] The prosecutor acknowledged F's importance to the state's case when she told the jury during closing argument that, "if you find the testimony of . . . F credible, then you can find every single element of each crime

that the state has charged in this case proven beyond a reasonable doubt."

[26] Defense counsel tried and failed to elicit truthful and complete testimony from F regarding the pretrial meeting. Defense counsel also did not attempt to cross-examine Kumnick regarding the state's representations to F. Therefore, this is another factor demonstrating that the jury did not ultimately hear the truth regarding the state's representations to F that it would inform the part B prosecutor of her interest in entering a sobriety program.

[27] We are not swayed by the defendant's argument that F may have required an inducement to testify because M did not testify at trial and a prior trial had to be cancelled when the state was unable to locate either M or F. The defendant's suggestion that both complainants chose not to testify in the first trial, rather than being impossible to locate, is speculative.

[28] During the prosecutor's direct examination of Berrios, the following exchange occurred:

"[The Prosecutor]: And that subpoena, specifically to this case that you were subpoenaed to be here for, what was your involvement with the case?

"[Berrios]: I did a [photographic] array for the victim no. 2.

"[The Prosecutor]: And victim no. 2, do you recall her initials?

"[Berrios]: F., I think."

[29] Following Ortero's statement, for example, the trial court instructed the jury: "Ladies and gentlemen, I'm going to say it, it is your decision as to what happened that night. Several witnesses have referred to individuals as victims. That is not proper. They're complainants. You will decide, and only you will decide, what happened, if anything, that night. So, every time [you hear] the description victim, strike it from your mind and disregard it."

[30] The prosecutor also corrected Ortero when he used the term, requesting that he use the word "complainants" instead. We emphasize, in this respect, that the prosecutor should be admonishing the state's witnesses, as the prosecutor did here, especially law enforcement officers, of their obligation not to refer to complainants as victims.

[31] Specifically, the trial court advised the jury: "On several occasions, witnesses referred to one or both of [the complainants] using the term 'victim.' Remember, it is for you to decide if a crime was committed and if the defendant committed a crime against them. The state must prove that beyond a reasonable doubt."

———————————————