******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
CHRISTOPHER J. IVERSON
(SC 20844)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder, attempt to commit murder, burglary in the first degree,
and arson in the first degree in connection with the stabbing death of the
victim and assault of the victim's son, the defendant appealed to this court.
The defendant claimed that the trial court had improperly denied his request
to charge the jury on manslaughter in the first degree as a lesser included
offense of murder and had improperly admitted a report concerning the
victim's autopsy that was prepared by a medical examiner who did not
testify at the defendant's trial. *Held*:

The trial court correctly determined that the defendant was not entitled to
an instruction on the lesser included offense of manslaughter in the first
degree, the defendant having failed to demonstrate that he satisfied either
the third or the fourth prong of the test set forth in *State* v. *Whistnant* (179
Conn. 576) for determining whether a defendant is entitled to a lesser
included offense instruction.

The defendant did not present sufficient evidence at trial to justify a convic-
tion of manslaughter in the first degree, and the evidence presented with
respect to the element that differentiates manslaughter from murder, namely,
whether the defendant acted recklessly with extreme indifference to human
life or whether he acted intentionally, was not sufficiently in dispute to
permit the jury to find the defendant not guilty of murder but guilty of first
degree manslaughter.

Specifically, the state presented overwhelming evidence that the defendant
had intended to kill the victim, and there was no evidence that would have
supported a conclusion that the defendant had acted recklessly in causing
the victim's death.

The defendant could not prevail on his unpreserved claim that the trial
court had improperly admitted into evidence an autopsy report that was
prepared by a medical examiner who performed the autopsy but who did
not testify at the defendant's trial, in violation of the defendant's constitu-
tional right to confrontation.

Because defense counsel made a strategic decision at trial not to object to
the admission of the autopsy report, autopsy photographs, and the testimony
of another medical examiner who observed the autopsy and testified about
the autopsy on the basis of her own opinions, defense counsel waived the

defendant's confrontation clause claim, and the defendant's claim on appeal therefore failed under the third prong of *State* v. *Golding* (213 Conn. 233), as modified by *In re Yasiel R.* (317 Conn. 773).

Argued April 17—officially released July 15, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, attempt to commit murder, burglary in the first degree, and arson in the first degree, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Kwak, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Shanna P. Hugle*, deputy assistant public defender, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don Therkildsen*, supervisory assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. Following a trial, the jury found the defendant, Christopher J. Iverson, guilty of murder in violation of General Statutes § 53a-54a (a), attempted murder in violation of General Statutes § 53a-49 (a) (2) and § 53a-54a (a), burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), and arson in the first degree in violation of General Statutes § 53a-111 (a) (1). The trial court subsequently sentenced the defendant to a total effective sentence of 105 years of imprisonment for those crimes. In this direct appeal,[1] the defendant asserts that the trial court improperly (1) denied his request to charge the jury on the lesser included offense

[1] Pursuant to General Statutes § 51-199 (b) (3), "an appeal in any criminal action involving a conviction for a . . . class A felony" shall be taken directly to this court.

of manslaughter in the first degree, and (2) admitted into evidence an autopsy report authored by a nontestifying expert in violation of his confrontation rights under the federal constitution. Because the evidence was insufficient to justify an instruction on the lesser included offense of manslaughter and the defendant waived any challenge to the admission of the autopsy report, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 28, 2018, the victim was at home with her eleven year old son, J.[2] The victim's husband was out of the home, working an overnight shift. In the early morning hours, J was woken up when the victim suddenly grabbed his leg. She begged J to "call your daddy, I'm getting killed." J saw the defendant, whom he recognized as a longtime family friend, stabbing the victim with a knife from the home's kitchen knife set. J sprang into action and shoved the defendant away from the victim. The defendant then ran back toward the victim and continued to stab her. During this vicious attack, the victim asked the defendant, "[w]hy are you doing this," to which the defendant responded, "[b]ecause I hate you." The defendant continued to stab the victim until she ultimately collapsed on the bedroom floor and bled to death.

After fatally stabbing the victim, the defendant threatened to "slice [J's] throat" if he identified the defendant as the perpetrator. The defendant next grabbed J and tied him to a chair near his deceased mother, using a pair of headphones, a jump rope, and J's karate belt. The defendant then went into the kitchen and grabbed

---

[2] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

a beer bottle. He returned to the bedroom and struck J in the back of his head with the beer bottle, rendering him unconscious. While J was unconscious, the defendant entered the bedroom of the victim and her husband, took one of her husband's clean shirts and put it on. He took off his dirty shirt and wrapped it around the bloody knife before returning to J's bedroom to take the victim's and J's cell phones.

After changing his shirt, the defendant set fire to the bedspread in the victim and her husband's bedroom, the shear window curtain in the living room, the bathroom shower curtain, and the bathroom window curtain. Believing the fires would engulf the crime scene and kill J, the defendant left the victim's home and walked toward his own home, disposing of his shirt, the knife, and the cell phones in two different storm drains along the way.

Once the victim's husband finished his work shift, he drove directly home and arrived around 7:15 a.m. Noticing that the back door was slightly ajar, the victim's husband entered the home and found that the lights were off and the home smelled of smoke. J freed himself from his restraints and yelled to his father to "come go look in my room." The victim's husband raced into J's room and found the victim on the floor covered in cuts and blood. The victim's husband called 911 and performed cardiopulmonary resuscitation until the police arrived. Once the police and paramedics arrived on the scene, the paramedics pronounced the victim dead.

Shortly thereafter, J identified the defendant as the perpetrator, and the police immediately brought the defendant in for questioning. The defendant signed a *Miranda*[3] waiver and spoke with detectives. Initially, the defendant claimed that the last time he had spoken to anyone from the victim's family was one week prior,

---

[3] Miranda v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

when they all had returned from a joint family vacation in Florida. He further denied going to the victim's residence that evening and claimed he was in bed by 1 a.m.

Eventually, however, the defendant admitted that he had an affair with the victim that had ended several years earlier. He claimed that, on the evening of the incident, the victim invited him over. When he arrived, the victim was intoxicated[4] and held a frying pan decorated with yellow flowers[5] in one hand and a knife in the other. The victim then told the defendant, "you're not going to leave here alive anyway." The victim and the defendant began to "tussle . . . ." According to the defendant, the victim had already tied up J in his room. The defendant told the police that he tried to flee into the victim and her husband's bedroom but that the victim took a yellow BIC lighter and flicked it on the bed, causing the mattress to ignite. He claimed that he then went back into J's room and attempted to untie him, but the victim jumped on his back and the two tumbled to the ground. During the scuffle, he heard the victim exclaim that she stabbed herself. The defendant said that he did not remember anything beyond that and believed he must have then blacked out.[6]

When detectives confronted the defendant about the possibility that he could have stabbed the victim after the "tussle" without realizing it, he first responded, "no" but then said, "I'm not even sure. I'm not gonna say yes. I'm not gonna say no." The defendant claimed that, when he awoke from his blackout, he saw the knife

---

[4] Despite the defendant's assertion that the victim was intoxicated and that he could smell alcohol on her breath, "the toxicology report was negative for any [alcohol] . . . ."

[5] Investigators never recovered a frying pan matching the defendant's description at the scene.

[6] At trial, the defendant did not claim that he acted in self-defense or seek a self-defense instruction. He also admitted during cross-examination that whoever stabbed the victim did so intentionally.

sticking out of the victim and took the knife out of her body. He explained that he then left the house out of fear and walked home. He told the detectives that, on his way home, he purchased a bottle of water from the gas station to wash his hands of the victim's blood. After adamantly denying that he took the victim's and J's cell phones, the defendant finally admitted that he did take them from the scene. The defendant then directed Detective Peter Morgan to two different storm drains located along the route he took to go home. The police recovered the cell phones and the knife wrapped in a shirt from the two storm drains. Shortly thereafter, the defendant was arrested.

The victim's autopsy revealed that her "cause of death [was] sharp force injuries of the torso and extremities." Sharp force injuries are "a classification of injuries . . . use[d] to describe any time a sharp implement is used to cut someone's body." More precisely, the victim sustained twenty-six "stab wounds and incised wounds" to her body. Nine of them were stab wounds, meaning that they were "deeper into the body than they [were] long on the surface of the skin." Seventeen were incised wounds, meaning that they were "longer on the skin [than] they [were] deep." Three of the stab wounds were to the victim's neck, chest, and right armpit. The other six were on her back, aligned along the left side of the spine. One of the wounds, cutting into her jugular vein, likely caused a "significant amount of bleeding . . . ." The deepest penetration of the stab wounds was about four inches.

The seventeen incised wounds were primarily found on the victim's upper extremities, including her hands. The location of the wounds on her hands was consistent with her trying to defend herself. Further examination revealed that the victim also had blunt force injuries to the head, as well as indications that she was strangled. The medical examiner concluded that the victim

died from the collective blood loss caused by the twenty-six sharp force injuries.

After a trial, the jury found the defendant guilty on all counts. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant first asserts that the trial court improperly denied his request to charge the jury on the lesser included offense of manslaughter in the first degree. Specifically, the defendant claims that he was entitled to an instruction on this lesser included offense pursuant to *State* v. *Whistnant*, 179 Conn. 576, 427 A.2d 414 (1980), because the evidence adduced at trial would have permitted the jury to find the defendant guilty of manslaughter in the first degree. We disagree.

The applicable legal principles are well established. "Although there is no constitutional right to have a jury consider possible lesser included offenses, Connecticut law entitles a defendant to a lesser included offense charge if his request satisfies the four requirements set forth in *State* v. *Whistnant*, [supra, 179 Conn. 588]." *State* v. *Crafts*, 226 Conn. 237, 250, 627 A.2d 877 (1993). "A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, [that] justifies conviction of the lesser offense; and (4) the proof on the element or elements [that] differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant [not guilty] of the greater offense but guilty of the lesser." *State* v.

*Whistnant*, supra, 588. "The *Whistnant* test is conjunctive, requiring satisfaction of all four prongs." *State* v. *Smith*, 262 Conn. 453, 461, 815 A.2d 1216 (2003).

"The defendant's claim that he had improperly been denied an instruction on a lesser included offense requires us, on appeal, to review the facts in the light most favorable to the defendant. . . . Whether one offense is a lesser included offense of another presents a question of law. . . . Accordingly, our review is de novo." (Internal quotation marks omitted.) *State* v. *Marsala*, 337 Conn. 55, 65, 252 A.3d 349 (2020).

We are unpersuaded by the defendant's contention that he meets all the requirements of the *Whistnant* test. Instead, we conclude that his claim fails on the third and fourth *Whistnant* prongs. See, e.g., *State* v. *Jones*, 289 Conn. 742, 762, 961 A.2d 322 (2008) ("[d]espite being conceptually distinct parts of the *Whistnant* formulation, the third and fourth prongs are subject to the same evidentiary analysis . . . [and, therefore, can be analyzed] simultaneously" (internal quotation marks omitted)). The defendant fails to meet the third prong because there was not sufficient evidence presented at trial to justify a conviction of manslaughter in the first degree. The defendant also fails to meet the fourth prong because the evidence presented on the element that differentiates manslaughter from murder—whether the defendant acted recklessly with extreme indifference to human life for manslaughter or acted intentionally for murder—was not sufficiently in dispute to permit the jury consistently to find the defendant not guilty of murder but guilty of manslaughter.[7]

---

[7] Manslaughter in the first degree under General Statutes § 53a-55 (a) (3) requires "that the defendant must have (1) engaged in conduct that created a grave risk of death, (2) acted recklessly, (3) acted under circumstances evincing an extreme indifference to human life, and (4) caused the death of the victim." *State* v. *Hughes*, 341 Conn. 387, 405, 267 A.3d 81 (2021). Murder, on the other hand, requires the defendant to act "with intent to cause the death of another person, [and also requires that] he causes the death of such person . . . ." General Statutes § 53a-54a (a).

The state unquestionably presented overwhelming evidence that the defendant had intended to kill the victim, and there was no evidence that would have supported a conclusion that the defendant acted recklessly in causing the victim's death. To start, the nature and extent of the victim's injuries demonstrated an intent to kill rather than recklessness. As this court has explained, the defendant's intent to kill can be inferred from evidence that the defendant used a deadly weapon and from the nature and number of wounds inflicted. See, e.g., *State* v. *Coleman*, 304 Conn. 161, 167–68, 37 A.3d 713 (2012) ("[t]he fact that the defendant stabbed [the victim] in her chest with a knife and did so deeply enough to penetrate her heart . . . would support an inference that he intended to kill her"); *State* v. *Edwards*, 247 Conn. 318, 322–23, 721 A.2d 519 (1998) ("[w]e have stated that [o]ne who uses a deadly weapon [on] a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill" (internal quotation marks omitted)). In the present case, the evidence established that the defendant used a kitchen knife to stab the victim and that she had twenty-six sharp force wounds. In addition, the evidence established that six of the stab wounds were in a fairly straight line on her back and that one of the stab wounds consisted of a cut through her jugular vein. See *State* v. *Rasmussen*, 225 Conn. 55, 72–73, 621 A.2d 728 (1993) (rejecting claim that trial court should have instructed jury on lesser included offenses of manslaughter because "[i]t requires nothing more than common sense to conclude that slashes to the neck of a conscious victim that severed the victim's jugular vein . . . are evidence of an intent to kill rather than mere recklessness"). Given the nature and extent of the victim's wounds, we conclude that there was overwhelming evidence of the defendant's intent to cause the death of the victim. During

cross-examination, the defendant agreed that whoever murdered the victim did so intentionally and not accidentally.

Moreover, we also are unconvinced by the defendant's argument that, because this was a sudden confrontation that was "spontaneous, unplanned, and lacked motive," he was entitled to an instruction on manslaughter in the first degree. As additional circumstances supporting this argument, he contends that he blacked out during the altercation and that the victim sustained only two stab wounds, the one to her hand and the other to her chest, while he was conscious. He testified that it was the victim who accidentally inflicted both of these wounds on herself while he was trying to run away.

"It is well established that intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation." (Internal quotation marks omitted.) *State* v. *Brown*, 345 Conn. 354, 373 n.10, 285 A.3d 367 (2022). In *State* v. *Crafts*, supra, 226 Conn. 237, the defendant, who was charged with murder, claimed that he was entitled to instructions on the offenses of manslaughter in the first and second degree because the evidence at trial suggested a sudden confrontation that resulted in the victim's death. Id., 238, 251–52. This court rejected the defendant's claim of a sudden confrontation as "too speculative" on the basis of the preplanning evidence that the defendant had rented a woodchipper before the killing to dispose of the victim's body. Id., 251.

Here, although there was no evidence of preplanning presented at trial, the defendant's own testimony does not supply the factual basis necessary to support a charge for manslaughter. He testified that the victim's fatal wounds were inflicted while he was unconscious and that he did not know who was responsible for stabbing the victim multiple times. He also testified that

he was defending himself from the victim's attack and that at least some of her wounds were self-inflicted. Thus, the defendant denied engaging in any conduct, reckless or otherwise, that caused the victim's death. But see *State* v. *Smith*, supra, 262 Conn. 473, 476 (determining that defendant was entitled to instruction on manslaughter in first degree after he responded, when police asked if he had killed victim, "I guess you could say we both did, *but not on purpose*" (emphasis in original; internal quotation marks omitted)). The defendant's denial of any conduct that would support a finding of recklessness fails to put the element of intent sufficiently in dispute.

Indeed, in addition to the number and nature of the stab wounds, J's testimony further removes any dispute regarding the intentional nature of this crime. J testified that he was awoken by the victim, pulling at his leg, as the defendant was attacking her. J then stated that he tried to defend the victim from the brutal attack by pushing the defendant away. The defendant, however, was not deterred and instead charged back toward the victim and resumed the attack. See *State* v. *Greenfield*, 228 Conn. 62, 78, 634 A.2d 879 (1993) (finding that defendant intended to cause victim's death after pursuing him through apartment). J also testified that, when the victim begged the defendant to explain why he was harming her, J heard the defendant reply that he hated her. J's testimony undoubtedly describes an intentional killing at the hands of the defendant.

Thus, the defendant's denial of any conduct—coupled with his admission to the jury that whoever inflicted the victim's wounds did so intentionally, the severity, depth and number of the victim's stab wounds, and J's testimony about the sustained and vicious nature of the attack—makes the defendant's theory of a spontaneous tussle far "too speculative" to warrant an instruction on a lesser charge. See, e.g., *State* v. *Tomlin*, 266 Conn.

608, 631, 835 A.2d 12 (2003) ("[we] expressly [reject] the proposition that a defendant is entitled to instructions on lesser included offenses based on merely theoretical or possible scenarios" (internal quotation marks omitted)). Put differently, there is no construction of this evidence, even in the light most favorable to the defendant, that would suggest anything other than an intentional killing.

In light of the evidence presented at trial, we cannot conclude that the defendant satisfied either the third or fourth prongs of *Whistnant*. We agree with the trial court that the defendant was not entitled to an instruction on the lesser included offense of manslaughter in the first degree.

## II

The defendant also claims that the trial court improperly admitted into evidence an autopsy report prepared by a nontestifying expert in violation of his right to confrontation under the sixth and fourteenth amendments to the federal constitution. The defendant acknowledges that he did not raise this claim at trial, so he seeks review of his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[8] The state asserts that defense counsel made a strategic decision not to object to the autopsy report or the medical examiner's testimony and therefore has waived this claim. Consequently, the state contends, there is

---

[8] A defendant may prevail on an unpreserved claim under *Golding* when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

no constitutional violation because a waived claim fails under the third prong of *Golding*. We agree with the state.

The following additional facts and procedural history are necessary for our resolution of this claim. On the second day of trial, defense counsel sought to preclude the state from admitting into evidence three photographs of the crime scene that depicted the victim's wounds. He argued that the photographs had little probative value because "there's no dispute as to the cause or manner of death in this case." He further explained that "[t]he crime scene [photographs] are not necessary . . . to assist the medical examiner . . . in describing the cause of death or the manner of death," and, given their gruesome nature, their probative value was outweighed by their prejudicial effect.

The prosecutor claimed that the crime scene photographs would corroborate not only the medical examiner's testimony but also the testimony of J and the paramedics. The court, concerned with cumulative evidence, asked the prosecutor, "[w]on't the [medical examiner] be able to show how many incisions or stab wounds . . . the victim sustained?" The prosecutor responded, "according to the [*medical examiner's*] *report* and the *autopsy photographs*, they will document every single wound." (Emphasis added.) Defense counsel responded that, even if the three crime scene photographs were relevant, the rules of evidence still permit the exclusion of evidence when there is "the needless presentation of cumulative evidence . . . [and], with what the [medical examiner is] bringing in, [that] should be enough" to warrant exclusion of this evidence. The court "agree[d] with [defense counsel] that [the crime scene photographs] could be too prejudicial to the defendant. Any information the state needs can be brought forth through the [medical examiner]. The number of stab wounds, the manner of death, that's

where [the court] think[s] it's also cumulative . . . ." As a result, the court excluded two of the photographs, but it allowed one of them to be admitted, as it was merely a close-up of a previously admitted photograph.

The next day, when Deputy Chief Medical Examiner Maura DeJoseph testified, she made it clear that, even though she observed the autopsy, she did not personally conduct the autopsy or author the autopsy report.[9] She explained that the author of the report, Associate Medical Examiner Angela McGuire, was no longer employed by the Office of the Chief Medical Examiner. During DeJoseph's testimony, after she explained that she had not conducted the autopsy, the prosecutor moved to introduce into evidence the autopsy report authored by McGuire.[10] The trial court asked defense counsel directly if he had any objections. Defense counsel replied, "[n]o, Your Honor." Thereafter, the trial court admitted the exhibit containing the autopsy report.[11] DeJoseph then testified about what each autopsy photograph depicted to catalog the victim's various injuries for the jury.

[9] When asked, "based on your autopsy of [the victim], within the bounds of reasonable medical certainty, have you formed an expert opinion concerning her cause of death," DeJoseph responded: "Yes. Just for clarification though, I did not perform the autopsy, but I was present when the autopsy was performed. So, I have reviewed everything and concluded—made my own opinion about the findings."

[10] The autopsy report was admitted into evidence as part of state's exhibit 61. That exhibit was composed of the autopsy report, the anthropology consultation report, the toxicology report, an identification form, a fingerprint identification form, an evidence-out receipt to the crime lab, and an evidence-out receipt to the police department. The defendant does not challenge the admission of the other reports in this exhibit on appeal. The autopsy photographs of the victim's body were not part of the autopsy report and were addressed separately from the admission of the autopsy report. See footnote 11 of this opinion.

[11] The autopsy photographs are separate exhibits from the autopsy report. The parties agreed, before DeJoseph's testimony, that these photographs would be admitted. When the prosecutor indicated to the court that there was an agreement that these twenty-two photographs could be admitted as full exhibits, defense counsel confirmed, "[t]hat is correct."

Defense counsel had the opportunity to cross-examine DeJoseph but declined to do so.

On appeal, the defendant asserts that he has satisfied *Golding* because the trial court's decision to admit the autopsy report into evidence constituted a violation of his constitutional right of confrontation and was harmful. We disagree and conclude that his claim fails under the third prong of *Golding* because he waived it.

It is well established that "[a] waived claim, as opposed to an unpreserved claim, does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . It is well established that [a] defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . The mechanism by which a right may be waived . . . varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel. . . . The decision to admit or exclude evidence on constitutional, statutory, or evidentiary grounds is the type of tactical trial decision that appropriately may be waived by counsel acting alone . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Culbreath*, 340 Conn. 167, 179–80, 263 A.3d 350 (2021).

In the present case, a review of the record demonstrates that defense counsel was aware that DeJoseph had not conducted the autopsy. Despite knowing this fact, when the court asked defense counsel directly if he had any objection to the admission of the report, he replied, "[n]o, Your Honor." The decision not to object appears to be part of defense counsel's trial strategy. Indeed, at the hearing on the motion to suppress the

crime scene photographs, defense counsel, in significant part, justified his objection to the admissibility of the crime scene photographs on the basis of the anticipated admission of the testimony of the medical examiner regarding the number and extent of the victim's injuries. To be sure, our review of the autopsy photographs, the admission of which defense counsel also did not object to, confirms that the number of stab wounds and the manner of death are depicted in a more sanitized manner than they are in the gruesome crime scene photographs that defense counsel sought to suppress.

On the basis of our thorough review of the record, we conclude that defense counsel's decision not to object to the admission of the autopsy report was a strategic decision made to strengthen his argument that the court should preclude admission of the crime scene photographs. Given that defense counsel made a strategic choice to seek to preclude the crime scene photographs but raised no objection to the admission of the autopsy report, the medical examiner's testimony or the autopsy photographs, we cannot conclude that the trial court violated the defendant's constitutional rights by admitting these items into evidence. See, e.g., *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 73, 967 A.2d 41 (2009) ("[t]o allow the [defendant] to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal" (internal quotation marks omitted)).

Lastly, the defendant claims that he could not waive his constitutional claim because the controlling precedent changed in 2024, when the United States Supreme Court decided *Smith* v. *Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024). See *State* v. *Johnson*, 345 Conn. 174, 188–89, 283 A.3d 477 (2022) ("when the law governing a defendant's constitutional claim has

changed after the defendant's trial, counsel acting under binding precedent in effect at the time of the trial cannot make a knowing and intelligent waiver of rights affected by the later decision changing the law"). We disagree because *Smith* did not change the controlling law governing the defendant's claim. *Smith* held in relevant part that "[a] [s]tate may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. . . . Neither may the [s]tate introduce those statements through a surrogate analyst *who did not participate in their creation.* . . . And nothing changes if the surrogate . . . presents the out-of-court statements as the basis for his expert opinion." (Citations omitted; emphasis added.) *Smith* v. *Arizona*, supra, 802–803.

This holding is consistent with controlling precedent in existence since at least 2011. Indeed, in *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the United States Supreme Court explained that "surrogate testimony"—when the testifying expert neither participated in nor observed the test but worked in the same laboratory as the nontestifying expert who conducted the test—does not satisfy the confrontation clause because the testifying "surrogate" could not convey what the original expert knew or observed about the particular test utilized. Id., 652, 661. In *State* v. *Walker*, 332 Conn. 678, 212 A.3d 1244 (2019), decided more than three years before trial in the present case, we relied on *Bullcoming* to hold that an expert may testify regarding a nontestifying expert's results only if the testifying expert personally observed the testing or retested the raw materials herself. Id., 716–19.

In the present case, it is undisputed that DeJoseph personally observed the autopsy being conducted, reviewed the autopsy findings and photographs, and

formed her own opinions. See footnote 9 of this opinion. Because *Smith* v. *Arizona*, supra, 602 U.S. 779, did not change the law regarding the constitutional right of confrontation applicable to these circumstances, "we must presume that defense counsel was aware of the defendant's federal constitutional claim and made a strategic decision to waive it." *State* v. *Culbreath*, supra, 340 Conn. 182.

Accordingly, defense counsel waived the defendant's constitutional claim at trial, and the defendant's claim fails under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other justices concurred.