******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DAMOND BESTER
## (SC 20858)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

### *Syllabus*

Convicted of murder and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. He claimed, inter alia, that his constitutional right to confrontation was violated when the trial court allowed G, the state's gunshot residue expert, to base her testimony on the data and notes of K, the analyst who performed the gunshot residue test but who did not testify at trial, and when the prosecutor, while cross-examining the defendant, elicited certain testimonial hearsay statements. *Held*:

The defendant's unpreserved claim that his right to confrontation was violated when the trial court allowed G to base her testimony on the data and notes of K failed under the first prong of *State* v. *Golding* (213 Conn. 233), as the record was inadequate to determine whether K's data and notes were testimonial in nature.

This court declined to adopt the state's proposed blanket rule, which was based on its assertion that the confrontation clause is not self-executing, that all confrontation claims that are not preserved at trial are forfeited and thus not reviewable under *Golding*.

The state's proposed rule ran the risk of undermining the purpose of *Golding* review, which is to save unpreserved but meritorious constitutional claims that implicate fundamental rights when the record is adequate for appellate review, by eliminating a narrow class of unpreserved but not affirmatively waived confrontation clause claims, even when a constitutional violation is apparent from an adequate record.

The confrontation clause's prohibition against the admission of an unavailable witness' out-of-court statements applies only to testimonial hearsay, and a determination of whether hearsay is testimonial is dependent in part on whether the declarant had a reasonable expectation, under the circumstances, that his or her words subsequently could be used for purposes of prosecution.

In the present case, because no written report pertaining to gunshot residue testing was admitted into evidence, and because G offered no specificity when referring to K's data and notes, the nature, contents, and information contained in that material were not clear, and without that information, this court could not identify the substance of K's out-of-court statements or

determine the principal reason they were made; accordingly, the record was inadequate for review.

The defendant could not prevail on his unpreserved claim that his right to confrontation was violated when the prosecutor elicited from him on cross-examination certain testimonial hearsay statements that had been made by the defendant's girlfriend and his cousin.

Neither the defendant's girlfriend nor his cousin testified at trial, the prosecutor's questions did not introduce the girlfriend's or the cousin's statements into evidence, and the prosecutor's questions themselves did not constitute testimony.

Moreover, the prosecutor, in posing the questions at issue, sought to impeach certain testimony that the defendant had given on direct examination, and, because statements introduced solely to impeach a witness are not offered for their truth and therefore are not hearsay, the defendant failed to demonstrate a confrontation clause violation.

There was no merit to the defendant's unpreserved claim that his right to a fair trial was violated on the ground that the prosecutor had introduced into evidence facts outside of the record when he questioned the defendant about the weather at the time of the murder and about certain statements made by his girlfriend and his cousin.

No prosecutorial impropriety occurred, as defense counsel did not object to the challenged questions or claim that the prosecutor lacked a good faith basis to ask those questions, and the information sought in response to the questions was not inflammatory, inadmissible, unduly prejudicial, or in violation of a court order.

Argued September 17—officially released December 9, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford, where the charge of murder was tried to the jury before *K. Doyle, J.*; verdict of guilty; thereafter, the charge of criminal possession of a firearm was tried to the court, *K. Doyle, J.*; finding of guilty; judgment in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*James P. Sexton*, assigned counsel, with whom were *John R. Weikart*, assigned counsel, and, on the brief, *Emily Graner Sexton*, assigned counsel, and *Megan L. Wade*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Robin D. Krawczyk*, senior assistant state's attorney, and *Danielle M. O'Connell*, assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Damond Bester, appeals directly to this court from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), and, after a trial to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant raises three unpreserved claims: (1) his right to confrontation under the sixth and fourteenth amendments to the United States constitution was violated when the state's gunshot residue expert relied on the data and notes of a nontestifying state analyst who had performed the gunshot residue test but did not testify at trial, (2) his right to confrontation was violated when the prosecutor, during cross-examination of the defendant, elicited testimonial hearsay statements made by the defendant's girlfriend and cousin, and (3) the prosecutor's questions to the defendant on cross-examination improperly introduced into evidence facts outside of the record in violation of his due process right to a fair trial under the fourteenth amendment to the United States constitution. We affirm the trial court's judgment.

The jury reasonably could have found the following facts. On the afternoon of June 25, 2018, the defendant was driving a motor vehicle in downtown Hartford that collided with a motor vehicle driven by the victim, William David Smalls. The defendant and the victim

stopped and exited their vehicles, and the defendant admitted that he was at fault for the collision. Both men drove to a local auto body repair shop and obtained an estimate of $4433.95 to repair the damage to the victim's vehicle. To avoid having to contact their automobile insurance companies, the defendant and the victim exchanged telephone numbers and planned to meet that evening so that the defendant could pay the victim for the damage. Surveillance video of the collision and from the auto body repair shop depicted the defendant, a black man, wearing a red baseball cap, a white T-shirt with red lettering, and khaki colored shorts. The victim informed his fiancé, Natalie Fuller, that he was meeting with the defendant that night so that the defendant could pay him for the damage to the vehicle, and he sent her a photograph of a napkin that showed the defendant's name and cell phone number.

Four hours later, the victim and the defendant met on North Canaan Street in Hartford. The victim stopped his white Acura at the meeting place, and the defendant parked one block away and approached on foot. The defendant approached the passenger's side of the victim's vehicle and shot the victim twice while he was sitting in the driver's seat. The victim then crashed his vehicle into the curb and fell out of the vehicle and onto the street. Seeing the victim try to crawl to the passenger's side of his vehicle to obtain a gun from the glove box, the defendant walked to the driver's side, reached through the window, and shot the victim through the interior of the vehicle three more times as the victim reached into the vehicle. The defendant fled back to his vehicle and eventually drove home. The victim died of gunshot wounds to his head, neck, and torso.

Minutes after the shooting, the police arrived at the scene in response to Hartford's "Shot Spotter" detection system, which had registered gunshots in the area, as

well to a 911 call by an eyewitness, Robert Joseph. Joseph, a deacon at a nearby church, told the police that he had heard the first two gunshots as he was driving in the area of North Canaan Street and that, when he slowed his motor vehicle, he saw a person on the ground creeping toward a white Acura. Joseph saw a black male approach the white Acura and shoot the person three times as the person tried to climb into the passenger seat. Although Joseph did not see the shooter's face, he described him as a heavyset black male wearing a red baseball cap, a white T-shirt with red lettering, and khaki colored shorts. The police later showed Joseph a photographic array, and he identified the defendant from a screenshot taken from the auto body repair shop surveillance footage. Joseph identified the defendant as a person who resembled the shooter in that the defendant had a similar build and was wearing the same clothing as the shooter. The police quickly learned from Fuller that the victim was supposed to meet the defendant that night so that the defendant could deliver the money to repair the damage he had caused to the white Acura.

In the early morning following the shooting, the police found the defendant at his residence in Bloomfield. The police executed a search warrant at the home and seized, among other things, a red Nike hat, a white T-shirt with red lettering, and khaki cargo shorts. The defendant voluntarily went to the police station and agreed to an interview. He admitted to the police that his vehicle and that of the victim had collided the day before and that both men had gone to the auto body repair shop and agreed to meet later in a Hartford neighborhood. The defendant stated that he was wearing a red Nike baseball cap, a white T-shirt with red lettering, and khaki shorts. The defendant also told the police that he met the victim at their agreed meeting place, which corresponded to the location of the shooting.

The defendant stated that he "felt a little sketchy" as he approached the victim's vehicle because its brake light was illuminated and that, when the victim used an aggressive tone of voice to ask him, "where's the bread at,"[1] he panicked and started to walk away when he heard gunshots.

Evidence seized from the defendant's cell phone and obtained from his cell phone service provider showed that the defendant and the victim had called and texted each other minutes prior to the shooting. The cell phone data extraction also revealed that the defendant had deleted data of several phone calls with the victim. The police also learned that, shortly after the shooting, the defendant used his cell phone to search the Internet, and to access results, for motor vehicle rentals, whether a school near the shooting had "outside security cameras," and for "shootings today in Hartford." Although the police never recovered the victim's phone, the cell tower location information showed that both the defendant's and the victim's cell phones had connected to the same cell tower in East Hartford after the shooting. Scientific tests of the hat, T-shirt, and shorts seized from the defendant's bedroom all revealed the presence of particles characteristic of gunshot residue.

The defendant was arrested and charged with murder and criminal possession of a firearm. The jury found him guilty of murder, and the trial court found him guilty of criminal possession of a firearm. The court imposed a total effective sentence of fifty years of imprisonment. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court violated his confrontation rights by allowing the state's gunshot

---

[1] The defendant also testified at trial that the victim had asked him, "where's the bread at," which the defendant understood to mean, "where's my money . . . ."

residue expert, Alison Gingell, a forensic science examiner at the state forensic science laboratory, to base her testimony on the data and notes of Fan Kwak, the state analyst who had performed the gunshot residue test but who was no longer employed at the laboratory and did not testify at trial. It is undisputed that the defendant failed to preserve this claim at trial; thus, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[2] The state urges us to conclude that the confrontation clause is not self-executing, meaning that the defendant's failure to raise it at trial precludes him from invoking *Golding* review on appeal to assert its violation under any circumstances. The state also argues that the defendant's claim fails to satisfy the first prong of *Golding* because the record is inadequate to determine whether Kwak's notes and data were testimonial in nature. We disagree with the state's first argument but agree with its second argument.

A

The state asks us to hold for the first time that the confrontation clause is not self-executing, rendering all unpreserved confrontation clause claims forfeited and not reviewable under *Golding* as a matter of law.

We decline to adopt this blanket rule, which would require us to carve out a new exception to *Golding*

---

[2] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

review for this one class of constitutional claims. The state's proposed rule runs the risk of undermining the purpose of *Golding*, which "is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court. The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. . . . Nevertheless, *because constitutional claims implicate fundamental rights, it also would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation at trial.*" (Citation omitted; emphasis added.) *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). We have held that "*Golding* strikes an appropriate balance between these competing interests: the defendant may raise such a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review." Id. *Golding* exists to "protect the rights of the defendant and the integrity of the judicial system . . . ." (Internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 822, 160 A.3d 323 (2017).

To support its proposed exception to *Golding* review for unpreserved confrontation clause claims, the state relies on a partial quotation from *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), in which the United States Supreme Court stated that "[t]he defendant always has the burden of raising his [c]onfrontation [c]lause objection . . . ." (Emphasis omitted.) Id., 327. It is a truism that the defendant has the burden of raising his confrontation

clause objection at trial, but nothing in *Melendez-Diaz* precludes a state court from allowing appellate review of unpreserved confrontation clause claims under certain circumstances. See id. ("[s]tates are free to adopt procedural rules governing objections"). Consistent with this understanding, since *Melendez-Diaz*, we have often addressed unpreserved confrontation clause claims under *Golding*. See, e.g., *State* v. *Iverson*, 352 Conn. 422, 433, 336 A.3d 1212 (2025); *State* v. *Robles*, 348 Conn. 1, 11–12, 301 A.3d 498 (2023); *State* v. *Johnson*, 345 Conn. 174, 189, 283 A.3d 477 (2022).

Of course, a defendant's failure to invoke his right to confrontation at trial will often hinder *Golding* review of that claim. It will not foreclose review altogether, however. In the vast majority of cases, our appellate courts have rejected a defendant's unpreserved confrontation clause claim under *Golding* either because the record was inadequate or because the defendant affirmatively waived his confrontation rights. See, e.g., *State* v. *Iverson*, supra, 352 Conn. 436; *State* v. *Holley*, 327 Conn. 576, 601–604, 175 A.3d 514 (2018). Thus, our precedent makes clear to defendants and defense counsel that unpreserved confrontation clause claims face significant hurdles on appeal.

The state's proposed blanket rule, however, would eliminate a narrow class of unpreserved but not affirmatively waived confrontation clause claims even when a constitutional violation is apparent from an adequate record. See, e.g., *State* v. *Walker*, 332 Conn. 678, 716, 720, 212 A.3d 1244 (2019) (reversing judgment and ordering new trial after *Golding* review of confrontation clause claim); *State* v. *Calvin N.*, 122 Conn. App. 216, 229, 998 A.2d 810 (same), cert. denied, 298 Conn. 909, 4 A.3d 834 (2010); see also *State* v. *Smith*, 289 Conn. 598, 627–28, 960 A.2d 993 (2008) (applying *Golding* and holding that certain statements were admitted in violation of confrontation clause, although admission was

ultimately harmless); *State* v. *Vega*, 181 Conn. App. 456, 490, 187 A.3d 424 (same), cert. denied, 330 Conn. 928, 194 A.3d 777 (2018). This court established *Golding* review for the purpose of saving those few claims. We will therefore proceed to the traditional *Golding* framework.

B

We next address the state's argument that the defendant's confrontation clause claim fails to satisfy the first prong of *Golding* because the record is inadequate to determine whether Kwak's notes and data were testimonial in nature.

At trial, the state called Gingell to testify. On direct examination, she testified that gunshot residue is a type of trace evidence, not visible to the naked eye, which is deposited on surfaces, such as clothing, immediately following the discharge of a firearm. Gunshot residue is comprised of three specific elements: lead, barium, and antimony. She explained that laboratory examiners typically use a carbon adhesive stub to collect a sample from a piece of clothing, which she described as like a "bingo blotter" that has "an aluminum disc that has a black piece of double-sided sticky tape or carbon tape on the side . . . ." The examiner would blot the disc onto the area that might have trace evidence, and each sample has a unique identification number. After the examiner collects a sample, the disc "is removed from the sample holder and is placed into an instrument platform for the scanning electron microscope" (SEM).

Gingell further testified that the police submitted to the laboratory a hat, T-shirt, and cargo shorts for gunshot residue analysis in connection with the homicide investigation. Gingell said that Kwak was the analyst assigned to test those pieces of evidence. Gingell testified that she reviewed the data and photographs that Kwak had generated from his testing and had come to

her own independent conclusions. Gingell recognized the photographs of the defendant's hat, T-shirt, and cargo pants, and she indicated that her initials appeared on the bottom of the paperwork. She also recognized the physical stubs used to collect samples from the defendant's clothing, which she did not review personally but stated that she would have made sure that Kwak had correctly inventoried them.

She testified that Kwak collected one sample from the hat, two samples from the T-shirt (one on the top portion of the front area and one from the lower portion about halfway down), and four from the cargo shorts (right front pocket, left front pocket, right back pocket, and left back pocket). Gingell testified that samples from the clothing that Kwak took were within the scope of the laboratory's standard operating procedure. Gingell then testified that, based on her independent examination of Kwak's "data," she concluded that the samples collected from the hat, T-shirt, and cargo shorts all contained the elements lead, barium, and antimony, which was characteristic of gunshot residue. No gunshot residue report was admitted into evidence, and defense counsel did not object to any of the prosecutor's questions on direct examination. When the trial court specifically asked whether there was any objection to the admission of the photographs and stubs, defense counsel responded: "No objection . . . ."[3]

On cross-examination, Gingell testified that, although the police submitted the defendant's cell phone for analysis, it never was tested. On redirect examination by

---

[3] At oral argument before this court, the defendant's appellate counsel abandoned any claim relating to the introduction of the exhibits consisting of photographs of the items tested for gunshot residue because those exhibits generally are nontestimonial and, therefore, generally are not subject to scrutiny under the confrontation clause. See, e.g., *State* v. *Villanueva*, 352 Conn. 439, 467, 337 A.3d 734 (2025) (autopsy photographs were not hearsay and, thus, their admission into evidence did not violate confrontation clause).

the prosecutor, Gingell testified that Kwak's "notes" stated that he did not test the cell phone "because of laboratory procedure. When there are three or more particles that have characteristics of [gunshot residue] or lead, barium, and antimony present, there's no need to examine any more items that may be submitted."

"The [c]onfrontation [c]lause provides that [i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. In operation, the [c]lause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom. . . . And so the [c]lause bars the admission at trial of an absent [witness'] statements . . . unless the witness is unavailable and the defendant had a prior chance to subject her to cross-examination." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Arizona*, 602 U.S. 779, 783–84, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024); see also *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

"The [c]lause's prohibition applies only to testimonial hearsay—and in that two-word phrase are two limits. . . . First, in speaking about witnesses—or those who bear testimony—the [c]lause confines itself to testimonial statements . . . ." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Arizona*, supra, 602 U.S. 784. "Although . . . there is no comprehensive definition of 'testimonial' . . . much of the [United States] Supreme Court's and our own jurisprudence . . . largely has focused on the reasonable expectation of the declarant that, under the circumstances, his or her words later could be used for prosecutorial purposes." *State* v. *Slater*, 285 Conn. 162, 172, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). Second, "the [c]lause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter

asserted. . . . When a statement is admitted for a reason unrelated to its truth . . . the [c]lause's role in protecting the right of cross-examination is not implicated. . . . That is because the need to test an absent witness ebbs when her truthfulness is not at issue." (Citations omitted; internal quotation marks omitted.) *Smith* v. *Arizona*, supra, 785. To determine whether a statement is testimonial, "[a] court must . . . identify the out-of-court statement introduced, and must determine, given all the relevant circumstances, the principal reason it was made." (Internal quotation marks omitted.) Id., 800–801; see also id., 801 (directing courts to "consider exactly which of [the declarant's] statements are at issue").

Specifically, as to forensic evidence, the United States Supreme Court has made clear that a "[s]tate may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. . . . Neither may the [s]tate introduce those statements through a surrogate analyst who did not participate in their creation. . . . And nothing changes if the surrogate . . . presents the out-of-court statements as the basis for his expert opinion. Those statements . . . come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them." (Citations omitted.) Id., 802–803; see also *Bullcoming* v. *New Mexico*, 564 U.S. 647, 651–52, 656, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (admission into evidence of laboratory analyst's written findings certifying defendant's blood alcohol content level violated confrontation clause because analyst did not testify at trial, was not previously cross-examined, and "surrogate testimony" from different analyst was not substitute); *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 308–12 (introduction of analysts' affidavits cer-

tifying substance as cocaine violated confrontation clause because analysts did not testify at trial and were not previously cross-examined). "Thus, expert testimony is inadmissible under the confrontation clause if it is used as [a conduit] for the admission into evidence of the testimonial statements of others." (Internal quotation marks omitted.) *State* v. *Lebrick*, 334 Conn. 492, 525, 223 A.3d 333 (2020).

The record must be adequate for us to decide under *Golding* whether the introduction of forensic evidence violated the confrontation clause. "Under the first prong of *Golding*, for the record to be adequate for review, the record must contain sufficient facts to establish that a violation of constitutional magnitude has occurred. . . . [W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim. . . . As a result, we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 337 Conn. 175, 186–87, 252 A.3d 811 (2020); id., 187 (confrontation clause claim failed *Golding*'s first prong because inconsistent testimony made it speculative to conclude whether another analyst retested samples); see also *State* v. *Johnson*, 345 Conn. 174, 190, 192, 283 A.3d 477 (2022) (confrontation clause claim failed *Golding*'s first prong because ambiguous testimony did not establish analyst's involvement in generation of DNA samples).

Assuming, without deciding, that Gingell conveyed some of Kwak's statements to the jury to prove the truth of the matter asserted in those statements, we conclude that we do not have an adequate record to determine whether Kwak's data and notes were testimonial in nature. To resolve the defendant's confrontation

clause claim, we must know the substance of Kwak's data and notes. For instance, if Kwak's materials merely conveyed raw data generated by scientific equipment, like an SEM, then his data may be nontestimonial and not subject to the confrontation clause. See, e.g., *State* v. *Buckland*, 313 Conn. 205, 214–15, 96 A.3d 1163 (2014), cert. denied, 574 U.S. 1078, 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015); *Diggs* v. *State*, Docket No. 1728, 2019 WL 6654058, *25 (Md. App. December 6, 2019), cert. dismissed, 467 Md. 696, 226 A.3d 237 (2020); *Molina* v. *State*, 450 S.W.3d 540, 550 (Tex. App. 2014). On the other hand, if Kwak's work product, in the form of a report, contained his own analysis and conclusions about the presence of gunshot residue on the tested items, then his report could be testimonial, and Gingell could not convey to the jury those findings without running afoul of the confrontation clause. See, e.g., *People* v. *Topor*, Docket No. 1-17-0243, 2020 WL 1083858, *3 (Ill. App. March 3, 2020). Here, because Gingell offered no specificity when she referred to Kwak's data and notes, the nature, contents, and information contained in Kwak's materials are not clear. Without this information, we cannot identify Kwak's out-of-court statements or determine the principal reason they were made. See *Smith* v. *Arizona*, supra, 602 U.S. 784–85. Any conclusion in this case about what type of notes Kwak took that Gingell relied on would be purely speculative.

The defendant also argues that Kwak's statements were testimonial because Kwak worked at the forensic laboratory and expected the state to use his data and notes for later prosecutorial purposes. We are unable to say that this is true in every case, however, without knowing the content of the statements at issue. Instead, the testimonial inquiry is contingent on the nature of those data and notes. The United States Supreme Court in *Smith* recognized that "some records of lab analysts will not have an evidentiary purpose. . . . [F]or exam-

ple, that lab records may come into being primarily to comply with laboratory accreditation requirements or to facilitate internal review and quality control. . . . Or some analysts' notes may be written simply as reminders to self. . . . In those cases, the record would not count as testimonial. To do so, the document's primary purpose must have 'a focus on court.' " (Citations omitted.) Id., 802.

Finally, the defendant heavily relies on *State* v. *Walker*, supra, 332 Conn. 688–89, in which this court reviewed an adequate record to conclude that a confrontation clause violation had occurred. In *Walker*, the state's expert DNA witness personally tested a bandana found at the crime scene and determined that it contained the defendant's DNA, but her expert opinion was predicated on a DNA profile for the defendant generated, without her participation, by the nontestifying analysts of the "known processing group . . . ." Id., 684. Both the expert witness' testimony and her report, which had been admitted into evidence, explained the basis for her opinion and explicitly contained the information on which she relied, specifically, the DNA profile created by other analysts. Id., 686. From the expert's testimony and report, we were able to conclude that the DNA profile was testimonial in nature because the analysts created it to support an ongoing criminal investigation. See id., 697–98. Unlike in *Walker*, no written report dealing with gunshot residue was admitted in the present case, and, as we have explained, Gingell did not reveal what constituted Kwak's data and notes. The defendant's claim thus fails the first prong of *Golding*.

## II

The defendant next claims that the state's cross-examination of him introduced into evidence testimonial hearsay statements made by his girlfriend, Selena

Hampton, and his cousin, Russell Smith, in violation of his confrontation rights. The defendant concedes that he did not preserve this claim and therefore seeks review under *Golding*. We conclude that the first prong of *Golding* is satisfied, and, assuming without deciding that the second prong is satisfied, we conclude that the defendant's claim fails under *Golding*'s third prong because the prosecutor's questions did not introduce the statements by Hampton and Smith into evidence, and, thus, the defendant did not establish that a constitutional violation exists that deprived him of a fair trial.

During direct examination, the defendant testified that he was driving Hampton's vehicle when he collided with the victim, he was at fault for the collision, and Hampton was fully insured. On cross-examination, the defendant testified that the victim asked that they avoid calling the police or their respective insurance companies after the collision. The defendant denied that it was his idea to avoid contacting Hampton's insurance company and testified that he had told Hampton about the collision. To cast doubt on the defendant's answer, the prosecutor asked: "Did you know that [Hampton] was here the other day?" The defendant responded: "No. I didn't." The prosecutor then asked: "Did you know that she said you never told her about the accident?" The defendant answered: "No. I didn't." Defense counsel did not object to this line of questioning, and neither party called Hampton to testify at trial.

Also during cross-examination, the defendant testified that the police had seized his cell phone the day after the shooting and that he had obtained a new phone with the same phone number. The defendant denied using that new phone to call Smith three days after the shooting. The prosecutor then asked: "Didn't you say, I'm in some trouble, and [Smith] said, I don't want to know, but I'm here for you?" The defendant responded: "No. I didn't." Defense counsel did not object to this

question, and neither party called Smith to testify at trial.

As we explained in part I B of this opinion, the confrontation clause bars admission into evidence of prior testimonial statements of a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. See, e.g., *Smith* v. *Arizona*, supra, 602 U.S. 783; *Crawford* v. *Washington*, supra, 541 U.S. 68. We agree with the state that the defendant's confrontation clause claim fails because Hampton and Smith did not testify, and the prosecutor's questions did not introduce their statements into evidence. The prosecutor's questions could not constitute testimony because the prosecutor was not under oath, and "a question from counsel is not evidence of anything." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 317, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015); see also *State* v. *McCoy*, 331 Conn. 561, 572, 206 A.3d 725 (2019) ("[i]t is axiomatic that questions are not evidence"); *State* v. *Bonsu*, 54 Conn. App. 229, 235, 734 A.2d 596 (same), cert. denied, 251 Conn. 909, 739 A.2d 1249 (1999). Thus, the defendant was not denied his right to confront Hampton and Smith. See, e.g., *State* v. *Rice*, 167 Conn. App. 615, 627, 142 A.3d 1267 (rejecting confrontation clause claim challenging prosecutor's inquiry of witness because questions are not evidence), cert. denied, 323 Conn. 932, 150 A.3d 232 (2016).

Finally, even if there may be a circumstance in which a prosecutor's question combined with a witness' testimony could have confrontation clause implications; see, e.g., *United States* v. *Kizzee*, 877 F.3d 650, 658 (5th Cir. 2017); no such situation is before us. Here, the defendant answered "no" to each of the prosecutor's questions, and any arguably testimonial statements in the questions did not become evidence. Further, the

prosecutor's questions sought to impeach the defendant's testimony on direct examination about his conversations with Hampton and Smith. It is well known that statements introduced solely to impeach a witness are not offered for their truth and, therefore, are not hearsay. See, e.g., *Smith* v. *Arizona*, supra, 602 U.S. 785 ("[w]hen a statement is admitted for a reason unrelated to its truth . . . the [confrontation] [c]lause's 'role in protecting the right of cross-examination' is not implicated"). We conclude that the defendant's claim fails under the third prong of *Golding* because the defendant has not shown the existence of a constitutional violation.

## III

The defendant finally claims that the prosecutor's questions to him on cross-examination violated his federal due process right to a fair trial by improperly introducing into evidence facts outside of the record. The defendant argues that the prosecutor committed three improprieties by questioning him regarding facts not in evidence, namely, about the weather at the time of the incident, about Hampton's statements concerning the collision, and about Smith's conversation with the defendant after the collision. We disagree.

First, the defendant directs us to his testimony concerning his use of fireworks prior to the shooting. During Gingell's testimony, she explained that elements characteristic of gunshot residue—lead, barium, and antimony—can also be expelled from items besides guns, such as fireworks, Roman candles and brake dust. The defendant later testified that, on the evening before the shooting, he was wearing the same clothes and had used fireworks, including cherry bombs, Roman candles, M-80s, and firecrackers. The prosecutor asked the defendant whether he knew that it was raining on the day before the shooting, and the defendant answered:

"I don't recall it being rainy outside." Although the weather on the day before the shooting was not in evidence, defense counsel did not object to this question.

Second and third, the defendant claims that the same questions that we addressed in part II of this opinion, which the prosecutor posed to him on cross-examination, violated his right to due process, namely, the prosecutor's questions about whether the defendant (1) knew that Hampton "was here the other day" and that she "said you never told her about the accident"; and (2) had told Smith after the shooting that "I'm in some trouble, and [Smith] said, I don't want to know, but I'm here for you?" The defendant responded, "[n]o. I didn't," to both of these questions.

"When considering a prosecutorial impropriety claim, the court engages in a two step process. We must determine (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . It is the defendant's burden to satisfy both steps." (Citation omitted; internal quotation marks omitted.) *State* v. *Dabate*, 351 Conn. 428, 437, 331 A.3d 1159 (2025). "[I]t is entirely appropriate to ask properly phrased questions on cross-examination that relate to the credibility of a criminal defendant's direct testimony, even if those questions exceed the scope of the questioning on direct examination and refer to facts not in evidence." *State* v. *Diaz*, 348 Conn. 750, 775–76, 311 A.3d 714 (2024). "A cross-examiner may ask questions that are designed to rebut, impeach, modify, or explain any of the defendant's direct testimony . . . if he or she has a good faith belief that a factual predicate for the question exists." (Internal quotation marks omitted.) Id., 776; see also *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995). Thus, "[a] prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lack-

ing." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 556, 949 A.2d 1092 (2008). Compare *State* v. *Dabate*, supra, 351 Conn. 449 (prosecutor lacked good faith basis to question defendant whether he had planned to murder victim previously during trip to Vermont), with *State* v. *Diaz*, supra, 775–76 (defendant failed to establish that prosecutor lacked good faith belief for inquiry into defendant's alleged threats to witness and inconsistencies in police statement).

Upon our review of the record, we conclude that no prosecutorial impropriety occurred. Defense counsel did not object to the challenged questions and does not claim that the prosecutor lacked a good faith basis to ask any of them. Further, the information sought in response to those questions was not inflammatory, inadmissible, unduly prejudicial, or in violation of a court order. See, e.g., *State* v. *Diaz*, supra, 348 Conn. 776.

Although we conclude that the prosecutor's questioning in the present case did not constitute prosecutorial impropriety because the defendant did not prove that the prosecutor lacked a good faith basis to ask the questions, we caution the state to carefully phrase its questions to comply with our evidentiary rules. Nothing in this opinion should be read, therefore, to condone or otherwise approve of, for example, the questioning regarding what Hampton had told the state outside of court. By asking the defendant whether he was aware of what Hampton told the state, the prosecutor placed before the jury facts for which there was no evidentiary basis. Although the prosecutor properly asked if the defendant had previously told Hampton about the accident, when the defendant answered in the affirmative, the prosecutor should then have followed § 6-10 (c) of the Code of Evidence and sought a ruling from the court as to whether the defendant could be impeached through extrinsic evidence and, if so, should have called

Hampton as a witness in the state's rebuttal case. See, e.g., *State* v. *Rivera*, 335 Conn. 720, 736 n.5, 240 A.3d 1039 (2020) (foundation may be established (1) by making offer of proof, (2) record independently may establish relevance of proffered evidence, or (3) stating good faith belief that there is an adequate factual basis for inquiry); see also Conn. Code Evid. § 6-6 (b) (1) and (2) ("specific instances of conduct of the witness . . . for the purpose of impeaching the witness' credibility . . . may not be proved by extrinsic evidence"). The state acknowledged at oral argument before this court that the prosecutor could have elicited the information sought by these questions in a different manner, to avoid implying facts that were not in evidence.

The judgment is affirmed.

In this opinion the other justices concurred.